896 F.2d 1435
 TRANSCO LEASING CORPORATION, et al., Plaintiffs,
v.
UNITED STATES of America, et al., Defendants.
FIRST WICHITA NATIONAL BANK; First Wichita National Bank in
its capacity as representative of the claims of Barbara Ann
Williams; Tommy's Well Service, Inc.; and American Eagle
Insurance Company, Appellants-Appellees,
v.
Brenda MANUEL, as Executor of the Estate of Wayne Manuel, Et
Al.; Cynthia Manuel Ahart, individually and as
Administratrix of the Estate of Steven R. Ahart, Et Al.;
United States of America; American Excess Underwriters,
Inc.; Cynthia Manuel Ahart, as Succession Representative
and Curatrix of the Estate of Steven R. Ahart, Standard
Fittings Corporation, and Transco Leasing Corporation,
Appellees-Appellants.
 No. 88-1823.
 United States Court of Appeals,
Fifth Circuit.
 March 26, 1990.
 
 Gerald R. Powell (argued), Assoc. Prof., Baylor University, Waco, Tex., D. Bradley Dickinson, Mark A. Hendrix, Vial, Hamilton, Koch & Knox, Dallas, Tex., for First Wichita Nat. Bank.
 John D. Copeland, Dallas, Tex., for First Wichita as Representative of Barbara Williams.
 P. Michael Jung, Kevin H. Good, Strasburger & Price, Dallas, Tex., for First Wichita as Executor of Jack Williams and Tommy's Well Service.
 Christopher G. Gallavan, Johnson, Bromberg & Leeds, Dallas, Tex., for American Eagle.
 Guy D. Choate, Mary Noel Golder, Tom Webb, Webb, Stokes, Sparks, Parker, Junell & Choate, San Angelo, Tex., for Brenda Manuel, ind. & Adm., Tina Vidrine and Michael Manuel.
 Alex L. Andrus, III, Andrus & Doherty, Opelousas, La., for Brenda Manuel, individually and as Administratrix.
 Stephen Santillo, Glen Armentor & Associates, Lafayette, La., for Tina Vidrine & Michael Manuel.
 Richard C. Broussard (argued), Domengeaux & Wright, Lafayette, La., James C. Lopez, Opelousas, La., for Cynthia Manuel Ahart, individually and as Administratrix, Etc.
 Gary W. Allen, Director, Torts Branch, Civ. Div., Dept. of Justice, Washington, D.C., for U.S.
 Clayton E. Devin, Lori J. Bien, McCauley, MacDonald, Love, Devin & Brinker, P.C., Dallas, Tex., for Cynthia Manuel Ahart as Successor Rep. & American Excess Underwriters and Standard Fittings Corp.
 Bruce S. Sostek, Thompson & Knight, Dallas, Tex., for Transco Leasing Corp.
 Appeals from the United States District Court for the Northern District of Texas.
 Before LIVELY*, JOLLY, and DUHE, Circuit Judges.
 E. GRADY JOLLY, Circuit Judge:
 
 
 1
 This appeal involves two consolidated Federal Tort Claims Act cases for wrongful death and property damage arising out of a mid-air collision between two airplanes. The district court granted motions for partial summary judgment against the United States, holding that neither of the pilots was contributorily negligent. The district court entered partial summary judgment against the executor of the estate of one of the pilots on the ground that the administrative claim form filed by the executor did not encompass the claims of the surviving wife and daughter. After a lengthy bench trial, the district court held that the government was liable, and assessed damages. We affirm the summary judgments on the issue of pilot contributory negligence; reverse the summary judgment dismissing the claims of the surviving wife and daughter of pilot Williams; affirm, in part, and vacate, in part, the damage awards; and remand the case to the district court for further proceedings.
 
 
 2
 * Two airplanes, a Piper Navaho and a Cessna Skymaster, collided in mid-air near Addison, Texas on October 27, 1982. All persons aboard both aircraft were fatally injured in the collision, and both aircraft were destroyed.
 
 
 3
 The Piper was owned by Transco Leasing Corporation ("Transco") and was operated for Standard Fittings Corporation ("Standard") by its pilot, Steven Ahart. Another Standard employee, Wayne Manuel, and his five-year-old daughter, Renee, were passengers in the Piper.
 
 
 4
 The Cessna was owned by Tommy's Well Service and was piloted by Jack Williams, the sole occupant.
 
 
 5
 The collision occurred as the Piper was descending toward a landing at Dallas Love Field. Immediately prior to the collision the Piper was receiving radar vectors from the Dallas North Controller at the Dallas-Fort Worth Terminal Radar Approach Control ("TRACON"), in preparation for a visual approach and landing at Love Field. At the time of the impact, the Piper was on an assigned heading of 190 degrees (south). The Piper had departed earlier that day from Opelousas, Louisiana on an instrument flight rules ("IFR") flight plan. When flying IFR, the pilot is permitted to fly in clouds when necessary. Navigation and aircraft control are maintained by reference to cockpit instrumentation while the aircraft is in the clouds.
 
 
 6
 Approximately three minutes prior to the collision, the Cessna departed toward the southeast from Runway 15 at Addison Airport. Williams was flying the Cessna under visual flight rules ("VFR"). Under VFR, a pilot uses his own vision to navigate the aircraft, and is not permitted to fly in clouds. The Federal Aviation Administration ("FAA") Control Tower at Addison Airport was responsible for the sequencing of aircraft arriving and departing Addison under the visual flight rules ("VFR") weather conditions that prevailed that morning. Aircraft operating within five miles of Addison and below 3,000 feet above ground level were required by FAA regulations to maintain communications with Addison Tower.
 
 
 7
 After departing Addison to the southeast, Williams, the Cessna pilot, made a right turn and headed the Cessna in a northwesterly direction toward his intended destination, Nocona, Texas. At 11:19 a.m., Williams, apparently realizing that his projected course would take him through DFW's Terminal Control Area, requested and received permission from Addison Tower to contact DFW. At 11:19:28 a.m., Williams radioed DFW Departure Control (the same controller who was vectoring the Piper toward Love Field) as follows:
 
 
 8
 Departure, this is Skymaster 72430 inbound for Nocona, Texas, just departed Addison, climbing to 3500 feet, heading 300, request climbout as soon as possible, sir.
 
 
 9
 The controller misunderstood the transmission, mistakenly believing that Williams had departed Arlington (instead of Addison), and radioed back, "Okay, if you departed Arlington contact approach on 120.5." At about the time the controller began this mistaken transmission, the mid-air collision occurred, at an altitude of approximately 2250 feet above mean sea level, three miles northwest of Addison Airport.
 
 
 10
 A Letter of Agreement dated June 1, 1981 between the DFW Terminal Radar Control and Addison Tower established a special descent corridor within the Addison Airport Traffic Area. The agreement provided that when Love Field was landing on Runway 13, as it was on the date of the accident, the portion of the Addison Airport Traffic Area two miles west of a line parallel to Runway 15 at and above 2,000 feet could be used by DFW for descent purposes without prior coordination with Addison Tower.
 
 
 11
 Stored radar data indicated that the Dallas North controller's radar vectors to the Piper did not keep it within the Addison descent corridor established by the letter of agreement, and that the collision occurred within the Addison Airport Traffic Area at a point outside the descent corridor. There was no coordination between the Dallas North controller and Addison Tower with respect to the Piper's entry into the Addison Airport Traffic Area. Neither pilot received any traffic advisories from air traffic control personnel.
 
 II
 
 12
 The estate and wrongful death beneficiaries of Piper pilot Ahart sued the Williams estate, Tommy's Well Service, and the United States. The estate of Piper passenger Wayne Manuel and the wrongful death beneficiaries of Wayne and his daughter Renee sued the Williams estate, Tommy's Well Service, Standard, and the United States. First Wichita National Bank ("Bank"), as independent executor of the Williams estate, sued the Ahart estate, Standard, and the United States. The Bank sought to recover damages on behalf of Williams' wrongful death beneficiaries, his widow, Barbara A. Williams, and his daughter, Debra Williams Roan.
 
 
 13
 Tommy's Well Service sued the Ahart estate, Standard, and the United States, seeking damages for the destruction of the Cessna. Transco sued the Williams estate and the United States, seeking damages for the destruction of the Piper and for ground damages paid by Transco. American Excess Underwriters, Standard's workers' compensation insurer, intervened to recover workers' compensation death benefits paid to the Manuel and Ahart widows.
 
 
 14
 Numerous cross-claims, counterclaims, and third-party complaints for contribution and indemnity were asserted by the various parties.
 
 
 15
 The Ahart estate and Standard moved for partial summary judgment against the United States, alleging that there was no evidence of Ahart's negligence. The Williams estate later filed a similar motion, alleging that there was no evidence of Williams' negligence. The United States moved for partial summary judgment as to the wrongful death claim asserted by the Williams estate, alleging that Williams' widow and daughter did not satisfy the jurisdictional notice requirements of the FTCA.
 
 
 16
 The district court granted all of the motions, holding that neither pilot had any responsibility for the collision and that the Williams estate could not recover damages on behalf of Williams' wife and daughter because of deficiencies in the administrative claim form submitted by the Bank.
 
 
 17
 The consolidated cases then proceeded to trial. The only issues at trial were whether the government was negligent and the amount of damages sustained by the various claimants. The district court held that the United States was liable for the air traffic controller's negligence in failing to either keep the Piper within the proper descent corridor established by the letter of agreement, or to coordinate the Piper's descent outside the corridor with Addison Tower.
 
 
 18
 Judgment was entered against the United States as follows:
 
 
 19
 1. For Cynthia Ahart, wife of the Piper pilot: $601,639 in loss of earnings and non-wage items; $4,317.99 for funeral expenses; $11,605 for psychological care; and $500,000 for loss of love, affection and support, for a total of $1,117,561.99. The court also awarded Mrs. Ahart, as administratrix of her husband's estate, $250,000 on behalf of each of their two children for the loss of their father's support, affection, and guidance.
 
 
 20
 2. For Sandra Dugal, former wife of Piper pilot Ahart: $8,898 for loss of child support paid by Ahart. Dugal was also awarded, on behalf of Ahart's ten-year-old son, $250,000 for loss of the father's love, support, and guidance; $4,200 for the value of lost flying lessons, and $25,733 for college tuition that Ahart had promised to pay, for a total of $279,933.
 
 
 21
 3. For Brenda Manuel, wife of Piper passenger Wayne Manuel and mother of Piper passenger Renee Manuel: $352,029.61 for lost earnings; $7,183.72 in funeral expenses; and $500,000 each for the loss of love, affection and support of her husband and daughter, for a total of $1,359,213.33. As administratrix, she was awarded $100,000 for each of Manuel's two adult children, both of whom have reached a settlement with the United States and are no longer parties to this appeal.
 
 
 22
 4. For Transco, for the loss of the Piper: $145,435.23, of which $132,500 was subrogated to its insurer, United States Aviation Underwriters, Inc., as managers for the United States Aircraft Insurance Group.
 
 
 23
 5. For the Williams estate: funeral expenses of $14,399.75.
 
 
 24
 6. For American Eagle Insurance Company, the subrogated insurer of Tommy's Well Service: $31,326.15 for the loss of the Cessna.
 
 
 25
 7. For American Excess Underwriters, Inc., Standard's workers' compensation carrier, for subrogated benefits and funeral expenses: $33,687.02 from the proceeds awarded to Brenda Manuel, and $52,200.74 from the proceeds awarded to Cynthia Ahart.
 
 
 26
 These appeals and cross-appeals followed.
 
 III
 
 27
 The Bank, as executor of the Williams estate, argues that the district court erred in granting summary judgment in favor of the United States on the ground that the administrative claim filed by the Bank was defective and did not encompass the claims of Williams' surviving wife and daughter. The Bank contends that it had the authority to pursue the claims on behalf of the widow and daughter, and that the claim form was sufficient because it gave the government notice of the nature of the claim (wrongful death), the name and address of the decedent's spouse, the factual circumstances surrounding the incident, and the Bank's determination of the value of the claim.
 
 
 28
 The United States argues that the administrative claim form filed by the Bank failed to comply with the jurisdictional prerequisites of 28 U.S.C. Sec. 2675(a) because neither the widow nor the daughter provided the FAA with written notice of their claims, and that the Bank's authority to prosecute the actions on behalf of Williams' widow and daughter under Texas law does not excuse their failure to give the agency written notice of their claims.
 
 
 29
 The only notice given to the United States relating to the alleged wrongful death of Williams was a Standard Form 95 (an administrative claim form). The following information appeared in the space on the form entitled "Name and Address of Claimant": "H. Dustin Fillmore, Attorney for Wichita National Bank, Independent Executor of the Estate of Jack Williams, 1414 Oil & Gas Building, Fort Worth, Texas 76102." The attorney signed the form in the space entitled "Signature of Claimant." Although the widow's name and address were listed in the block entitled "Name and Address of Spouse, If Any," the widow was not identified as the claimant; nor was Williams' daughter mentioned anywhere on the form. The letters testamentary attached to the form did not mention the widow and daughter.
 
 
 30
 A plaintiff must give notice of his or her claim to the appropriate federal agency in order to maintain a suit against the United States under the Federal Tort Claims Act. 28 U.S.C. Sec. 2675(a). The giving of such notice is a jurisdictional prerequisite and cannot be waived. Section 2675(a) provides:
 
 
 31
 An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.
 
 
 32
 A claim is properly presented within the meaning of Sec. 2675(a) when the agency is given sufficient written notice to commence investigation and the claimant places a value on the claim. Adams v. United States, 615 F.2d 284, 289 (5th Cir.), clarified, 622 F.2d 197 (5th Cir.1980).
 
 
 33
 Two congressional purposes are served by requiring claimants to provide the relevant agency with notice of their claims:
 
 
 34
 First, in enacting the notice requirement, Congress sought "to ease court congestion and avoid unnecessary litigation, while making it possible for the government to expedite the fair settlement of tort claims asserted against the United States." This efficiency purpose, however, accompanies a second purpose "of providing for more fair and equitable treatment of private individuals and claimants when they deal with the government or are involved in litigation with their government."
 
 
 35
 Id. at 288 (citations omitted).
 
 
 36
 The government argues that the administrative claim form submitted by the Bank did not satisfy the jurisdictional requirements of Sec. 2675(a) because the Bank did not comply with the regulations promulgated under 28 U.S.C. Sec. 2672. Pursuant to 28 U.S.C. Sec. 2672, administrative agencies are authorized to settle claims presented to them. The Department of Justice promulgated regulations, 28 C.F.R. Secs. 14.1-14.11, pursuant to Sec. 2672. These regulations describe the settlement procedures to be followed by agencies and claimants. The procedure for presenting an administrative claim is set forth, in pertinent part, in 28 C.F.R. Sec. 14.3(c):
 
 
 37
 A claim based on death may be presented by the executor or administrator of the decedent's estate or by any other person legally entitled to assert such a claim in accordance with applicable state law.
 
 28 C.F.R. Sec. 14.3(e) further provides:
 
 38
 A claim presented by an agent or legal representative shall be presented in the name of the claimant, be signed by the agent or legal representative, show the title or legal capacity of the person signing, and be accompanied by evidence of his authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.
 
 
 39
 If the representative of the estate should provide inadequate information, 28 C.F.R. Sec. 14.4(a)(3) authorizes the government to request additional information from the personal representative:
 
 
 40
 (a) DEATH. In support of a claim based on death, the claimant may be required to submit the following evidence or information:
 
 
 41
 (3) Full names, addresses, birth dates, kinship, and marital status of the decedent's survivors, including identification of those survivors who are dependent for support upon the decedent at the time of his death.
 
 
 42
 In Adams v. United States, this court held that the jurisdictional notice requirements of Sec. 2675(a) were not to be read in the light of the regulations promulgated pursuant to Sec. 2672. The administrative claim form submitted by the claimants in Adams was not inadequate in content or detail, but the claimants failed to comply with a government request for additional information pursuant to Sec. 14.4 of the regulations. This court held that such noncompliance by the claimants did not jurisdictionally bar their suit. The court stated the notice requirements of 28 U.S.C. Sec. 2675(a) are independent of the regulations governing the settlement process promulgated pursuant to 28 U.S.C. Sec. 2672, and that noncompliance with Sec. 2672, and the regulations promulgated thereunder, "deprives a claimant only of the opportunity to settle his or her claim outside the courts." 615 F.2d at 290.
 
 
 43
 The Bank contends that the failure of the government to utilize Sec. 14.4 should not provide a basis for a holding that its claim is defective. The United States argues that the burden of identifying qualified claimants should not be placed on the government because it is both proper and more efficient to require that the one presenting claims on another's behalf provide such identification. The United States argues that the shifting of responsibility to the government to identify properly the claimants is particularly inappropriate in the light of Adams' holding that noncompliance by the claimants with such requests for additional information will not jurisdictionally bar a complaint.
 
 
 44
 Although we find considerable merit in the government's argument that the burden of identifying qualified claimants should rest with the one presenting claims on another's behalf, and not with the government, we do not find that to be a sufficient basis upon which to bar these claims under the circumstances in this case. The United States did not request that the Bank supplement the information contained in the claim form. Had it done so, and had that information been withheld, we would consider the issue left undecided by Adams : "the effect, if any, a claimant's refusal to comply with an agency's reasonable request for supplemental information to clarify an inadequate claim would have on the issue of jurisdiction." 622 F.2d at 197 (emphasis added).
 
 
 45
 The United States' contention is, however, that the claims of Williams' widow and daughter are barred because the Bank failed to comply with Sec. 14.3(e) of the regulations, which requires that a claim presented by a legal representative "shall be presented in the name of the claimant." The "claimants" within the meaning of Sec. 2675(a) are Williams' widow and daughter. Under the Texas Wrongful Death Act, an action for wrongful death is reserved for the exclusive benefit of the surviving spouse, children, and parents of the deceased. The action may be brought by any one or more of those individuals for the benefit of all. The statute, however, also confers upon the executor or administrator of the decedent's estate the authority to pursue a wrongful death action:
 
 
 46
 If none of the individuals entitled to bring an action have begun the action within three calendar months after the death of the injured individual, his executor or administrator shall bring and prosecute the action unless requested not to by all those individuals.
 
 
 47
 V.T.C.A., Civil Practice & Remedies Code Sec. 71.004. Under Texas law, the estate itself has no interest in the recoveries obtained by the statutory beneficiaries. Thus, although the executor has authority to prosecute an action for wrongful death, the actual claimants are the statutory beneficiaries, in this case Williams' wife and daughter. Albeit that the government is correct in its contention that they were not identified as the claimants on the administrative claim form in accordance with Sec. 14.3(e) of the regulations, such compliance is not a jurisdictional requirement. Regulation 14.3(e) was promulgated pursuant to 28 U.S.C. Sec. 2672, which gives agencies the authority to settle claims. Because this court held in Adams that the regulations promulgated pursuant to Sec. 2672 are independent of the jurisdictional notice requirements of Sec. 2675(a), the Bank's failure to comply with Regulation 14.3(e) is not a jurisdictional bar to the claims of Williams' widow and daughter. See also Champagne v. United States, 573 F.Supp. 488, 491 (E.D.La.1983).
 
 
 48
 The district court's determination that there had been no showing that the Bank had any right to represent the surviving wife and daughter as to their individual claims is erroneous because the summary judgment evidence included the state court clerk's certification of the Bank as independent executor of the Williams estate. As we have already noted, under Texas law, the Bank, as executor, had the authority to pursue the wrongful death claims on behalf of Williams' widow and daughter.
 
 
 49
 The government argues, however, that the Bank's authority to prosecute the actions on behalf of Williams' widow and daughter under Texas law does not excuse the failure of the widow and daughter to give the agency written notice of their claims. In support of its argument, the government relies on Van Fossen v. United States, 430 F.Supp. 1017, 1021 (N.D.Cal.1977), in which the court stated:
 
 
 50
 The proper interpretation of Regulation 14.3(c) is that any person who is intended to be the legal beneficiary of the wrongful death action under the substantive law of the place of the accident, is entitled to file an administrative claim. Whether that claimant eventually may have to rely on an appointed representative to bring the action in the courts of that state is an irrelevant consideration at the administrative stage.
 
 
 51
 The government's reliance on Van Fossen is misplaced. In Van Fossen, the administrative claim was filed by the wrongful death beneficiaries. The government argued that the claim was defective because, under Virginia law, only the personal representative of the deceased, and not the beneficiaries, was entitled to file an action for wrongful death. The court rejected that argument and held that the claim was not deficient. The court further noted that the administrative claims requirements of the FTCA are "meant to benefit claimants and in no way [are] designed to preclude them from their day in court." Id. at 1017. The requirements are "intended to lessen the court case load through fair settlement, not procedural default." Id. at 1022.
 
 
 52
 We conclude that the administrative claim form submitted by the Bank, on behalf of Williams' widow and daughter, satisfied the jurisdictional notice requirements identified in Adams: (1) the agency was given sufficient written notice to commence investigation; and (2) a value was placed on the claim. The Bank, as independent executor of Williams' estate, is a legal representative authorized by state law to pursue claims for wrongful death on behalf of the statutory beneficiaries. 28 C.F.R. Sec. 14.3(e) indicates that the government clearly contemplated that claims would be presented by such legal representatives. The Bank's failure literally to comply with that regulation is not a sufficient ground upon which to bar the claims of the surviving wife and daughter when the jurisdictional requirements of the FTCA have been satisfied. The summary judgment in favor of the United States with respect to the wrongful death claims of Williams' widow and daughter is therefore reversed, and those claims are remanded for further proceedings.
 
 IV
 
 53
 The United States, not contesting the finding of negligence against it, argues that the district court erred in granting summary judgment in favor of the pilots on the issue of pilot contributory negligence. The government contends that the pilots were under a legal duty to see and avoid one another, and that it came forward with sufficient evidence to demonstrate the existence of genuine issues of material fact concerning the extent and elevation of clouds near the collision site, the proximity of the aircraft to the clouds, and the opportunities for either or both pilots to see the other aircraft. Our review is, of course, confined to the record that was before the district court at the time it granted each of the motions for summary judgment, and we do not consider any evidence adduced at trial that was not part of the summary judgment records.
 
 
 54
 When a motion for summary judgment demonstrates the absence of evidence as to a material fact on which the nonmovant will bear the burden of proof at trial, the nonmovant must come forward with evidence which would be sufficient to enable it to survive a motion for directed verdict at trial. E.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-52, 106 S.Ct. 2505, 2511-12, 91 L.Ed.2d 202 (1986); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); Washington v. Armstrong World Industries, Inc., 839 F.2d 1121, 1122-23 (5th Cir.1988). The nonmovant must do more than point to "a metaphysical doubt about the material facts." Washington, 839 F.2d at 1121.
 
 
 55
 The government's liability under the Federal Tort Claims Act is to be determined by the law of the place where the act or omission occurred. 28 U.S.C. Sec. 1346(b); Richards v. United States, 369 U.S. 1, 9, 82 S.Ct. 585, 590, 7 L.Ed.2d 492 (1962). According to Texas law, the United States bore the burden of proof at trial on the issue of pilot contributory negligence. Under Texas law, the elements of negligence are: "the existence of a duty on the part of one party to another; a breach of that duty; and damages to the party to whom the duty was owed proximately caused by the breach of the duty." Lucas v. Texas Industries, Inc., 696 S.W.2d 372, 376 (Tex.1984).
 
 
 56
 * The first motion for partial summary judgment was filed on January 6, 1986 on behalf of Ahart and Standard Fittings, the pilot and operator, respectively, of the Piper aircraft that was approaching Love Field. In its opposition to this motion, the government disagreed with the factual allegations asserted by the Ahart estate, and noted that expert testimony would be necessary to demonstrate the bases for the government's allegations of pilot negligence. The government attached copies of official weather observations taken at airports within eight to twelve miles of the accident site which indicated that the Piper was most likely from 400 to 1400 feet below the base of the cloud cover, and therefore operating in visual conditions.
 
 
 57
 After further expert depositions were completed, the Ahart estate filed a supplement to its motion for summary judgment on June 11, 1986, claiming that the deposition testimony of the government's pilot expert, Richard Taylor, eliminated the issue of pilot contributory negligence. Although the government's pilot expert testified in his deposition that the cause of the collision was pilot error, he further testified that he could not tell whether Ahart was negligent, whether Williams was negligent, or whether both were negligent, and knew of no evidence that would indicate whether the pilots could see each other.
 
 
 58
 In its opposition to the supplementary motion, the government contended that the Ahart estate had taken Taylor's testimony out of context, and that what Taylor really meant was that there was no evidence that the pilots actually saw each other, citing the following testimony:
 
 
 59
 Q. Do you have direct evidence available to you that the pilot or the pilots of these two aircraft could see each other prior to the point of impact?
 
 
 60
 A. No. I don't think there is any evidence. I think they should have been able to. Whether they did, I don't--I have no way of knowing.
 
 
 61
 Mr. Wiegand [Government counsel]: Ask the question again. I think he was confused.
 
 
 62
 Q. My question was: Can you point me to any evidence that would indicate that the pilots could see each other?
 
 
 63
 A. No.
 
 
 64
 The government pointed out that Taylor had also testified in the same deposition that the collision occurred several hundred feet below the base of the clouds and in airspace where visibility was for all practical purposes unlimited; that one or both of the pilots were in a position to see and avoid one another; and that the flight profiles of the two aircraft as depicted by radar track information indicated that the pilot of the Piper (Ahart) probably had a better view of the other aircraft during the critical seconds before the impact.
 
 
 65
 In response to a hypothetical question, Mr. Taylor testified that, if the base of the clouds in the area of the collision were in fact 3000 feet MSL (above mean sea level, or about 2400 feet above ground level) and both aircraft were in VFR conditions for at least thirty seconds prior to impact, and the Cessna was on a heading of 300 degrees and the Piper on a heading of 190 degrees, it would be his opinion that both pilots would have had ample time to see and avoid one another.
 
 
 66
 Finally, the government informed the district court that the pilot expert retained by Tommy's Well Service had recently testified in an untranscribed deposition that he had personal knowledge of the weather conditions at the approximate time and place of the accident, and that the clouds were at 2500 to 3000 feet above ground level, well above the altitude of the collision. The government also informed the court that its expert in meteorology would offer an opinion to the same effect and advised that he had been made available for deposition.
 
 
 67
 Federal Aviation Regulation (FAR) 91.67(a) (28 C.F.R.) provides that:
 
 
 68
 When weather conditions permit, regardless of whether an operation is conducted under Instrument Flight Rules or Visual Flight Rules, vigilance shall be maintained by each person operating an aircraft so as to see and avoid other aircraft in compliance with this section. When a rule of this section gives another aircraft the right of way, he shall give way to that aircraft and may not pass over, under, or ahead of it, unless well clear.
 
 
 69
 The Federal Aviation Regulations have the force and effect of law. See In re N-500L Cases, 691 F.2d 15, 28 (1st Cir.1982); Rodriquez v. United States, 823 F.2d 735 (3d Cir.1987). It is generally well-settled that pilots operating in VFR weather conditions have the primary responsibility for avoiding collisions, regardless of whether they are proceeding in accordance with air traffic control instructions. Murff v. United States, 785 F.2d 552, 554 (5th Cir.), cert. denied, 479 U.S. 823, 107 S.Ct. 95, 93 L.Ed.2d 46 (1986). See also United States v. Schultetus, 277 F.2d 322, 328 (5th Cir.), cert. denied, 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960); Bibler v. Young, 492 F.2d 1351 (6th Cir.), cert. denied, 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974); Coatney v. Berkshire, 500 F.2d 290 (8th Cir.1974); Hamilton v. United States, 497 F.2d 370 (9th Cir.1974); Colorado Flying Academy, Inc. v. United States, 724 F.2d 871 (10th Cir.1984), cert. denied, 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986); Rodriquez v. United States, 823 F.2d 735 (3d Cir.1987).
 
 
 70
 The Ahart estate satisfied its Celotex burden by demonstrating, through Taylor's testimony, the absence of evidence on a key element of the government's contributory negligence claim: the breach of a duty by pilot Ahart. Taylor's testimony that either or both of the pilots acted negligently, and that he knew of no evidence to indicate which pilot was negligent, or whether both were negligent, is sufficient to demonstrate the absence of evidence to support an essential element of the government's defense of contributory negligence.
 
 
 71
 The United States, as the nonmoving party, thus had the burden of producing evidence in opposition to the Ahart estate's motion from which it could be determined that Ahart breached his duty to maintain vigilance so as to see and avoid Williams' aircraft. It was not sufficient under Texas law, as the United States seems to contend, for the government to produce evidence that either or both of the pilots were negligent.
 
 
 72
 The government cannot rely upon the doctrine of res ipsa loquitur here because, under Texas law, res ipsa loquitur does not apply "against multiple defendants who have exclusive, as opposed to joint, control over separate instrumentalities alleged to have caused plaintiff's injury." Beakley v. Houston Oil & Minerals Corp., 600 S.W.2d 396, 397 (Tex.Civ.App.1980). Here, the two aircraft were under the independent control of two separate entities, the two pilots.
 
 
 73
 Nor can the government rely upon the theory of alternative liability to shift to the pilots the burden of exculpating themselves. See Gaulding v. Celotex Corp., 772 S.W.2d 66 (Tex.1989); Restatement (Second) of Torts Sec. 433B (1963). The theory of alternative liability was initially adopted by the California Supreme Court in Summers v. Tice, 33 Cal.2d 80, 199 P.2d 1 (1948). In Summers, the plaintiff was struck in the eye when two hunters negligently fired their shotguns. Because the defendants fired simultaneously, the plaintiff was unable to identify which defendant was actually responsible for the injury. The California Supreme Court shifted the burden of proof to the defendants to offer evidence to determine which one caused the injury. The theory of alternative liability relaxes the plaintiff's burden of identifying the tortfeasor who caused the plaintiff's injury. Because the theory is only applicable when the plaintiff has already proved that independent acts of negligence were simultaneously committed by two or more tortfeasors, the theory has no effect on the burden of proof with respect to the element of breach of a duty. The theory is thus inapplicable in this case, even if we assume that it is recognized in Texas, because the government did not present evidence sufficient to support a finding that both defendants acted negligently.
 
 
 74
 In its opposition to the Ahart estate's motion for summary judgment, the United States presented evidence sufficient to support a finding that both pilots were operating under visual meteorological conditions at the time of the collision. Federal Aviation Regulation 91.67(a) and the case law thus make it clear that both of the pilots involved in this collision had a duty to maintain vigilance "so as to see and avoid other aircraft." Pursuant to the plain words of the regulation, Pilot Ahart was under this duty despite the fact that he was flying IFR and was proceeding in accordance with instructions from air traffic control personnel. The government thus satisfied its Celotex burden with respect to the first element of contributory negligence: the existence of a duty.
 
 
 75
 The government places strong reliance on FAR 91.67(a) and the case law holding that pilots have the primary responsibility for collision avoidance. The government argues that the fact that a collision occurred in airspace where visibility was for all practical purposes unlimited is "strongly suggestive" of a breach of this duty on the part of both pilots. We disagree. Without more, the fact that two airplanes collide in mid-air in visual meteorological conditions is not evidence of negligence on the part of both pilots or of negligence on the part of one, but not the other, pilot. The duty imposed upon pilots by the regulation is a duty to exercise vigilance so as to see and avoid other aircraft; it is not an absolute duty to see and avoid. The degree of care required is that degree of care that would be exercised by reasonably prudent pilot.
 
 
 76
 The government's expert, Taylor, testified in his deposition regarding the degree of vigilance pilots were required to exercise in order to comply with FAR 91.67(a). Taylor testified that he generally agreed with the recommendations regarding scanning found in the "Airman's Information Manual," a government publication containing guidelines for pilots, and testified that he would generally expect the "average" pilot to adhere, at a minimum, to those scanning guidelines. Pertinent portions of the Manual, read into the record by Mr. Taylor at his deposition, state:
 
 
 77
 (1) Scanning the sky for other aircraft is a key factor in collision avoidance. It should be used continuously by the pilot and copilot (or right seat passenger) to cover all areas of the sky visible from the cockpit.
 
 
 78
 (2) Effective scanning is accomplished with a series of short, regularly spaced eye movements that bring successive areas of the sky into the central visual field. Each movement should not exceed ten degrees, and each area should be observed for at least one second to enable detection. Although horizontal back-and-forth eye movements seem preferred by most pilots, each pilot should develop a scanning pattern that is most comfortable and then adhere to it to assure optimum scanning.
 
 
 79
 In addition, Taylor testified that a pilot should increase his vigilance in high-traffic areas, such as the airport traffic area in which the collision occurred. Taylor conceded, however, that the fact that a collision occurs is not evidence that establishes a failure to scan properly. Taylor testified that the collision was "more likely than not" the result of "a failure to scan properly," but he testified that he knew of no evidence from which it could be determined whether Ahart, Williams, or both, failed to conduct proper scanning so as to avoid the collision. In order to avoid summary judgment on the Ahart estate's motion, the government was required to come forward with evidence sufficient to support a finding that pilot Ahart was contributorily negligent. Our review of the evidence contained in the record before the court on summary judgment confirms that no evidence was presented that would have been sufficient to support a finding that pilot Ahart was negligent in failing to scan properly.
 
 
 80
 Taylor testified that many factors can affect the ability of a pilot to see another aircraft, including the deck angle or pitch of the aircraft, sun angle, illumination, background, paint schemes, and closure rate (determined by the speed of the respective aircraft and the angle at which they are converging), and admitted that, without more, the fact that the collision occurred is not evidence that establishes a failure by either of the pilots to scan properly for other aircraft.
 
 
 81
 In its opposition to the Ahart estate's motion for summary judgment, the government simply failed to produce evidence sufficient to support a finding that pilot Ahart had an opportunity to see and avoid Williams' aircraft, or from which a nonspeculative determination could be made as to whether Ahart breached his duty to maintain vigilance so as to see and avoid Williams' aircraft. Taylor's opinion testimony that the collision was caused by pilot error and occurred in airspace in which visibility was for all practical purposes unlimited, and his testimony that pilot Ahart was "probably" in a better position to see and avoid the Cessna, is immaterial because of his unequivocal testimony that he could point to no evidence from which it could be determined that either (1) both pilots were negligent; or (2) pilot Ahart was negligent, but pilot Williams was not.
 
 
 82
 In this case, there are four possibilities with respect to the question of pilot negligence: that neither pilot was negligent; that Ahart but not Williams was negligent; that Williams but not Ahart was negligent; or that both were negligent. The government could have avoided summary judgment in favor of Ahart's estate by presenting proof of either the second or the fourth of those possible conclusions. Instead, the government's proof, if assumed to be true, negated only the first possibility, but did nothing to permit a rational choice among the other three possibilities.
 
 
 83
 The government's reliance on Taylor's response to a hypothetical question is misplaced. Taylor was asked to assume that the base of the clouds in the area of the collision was 3000 feet above mean sea level, that both aircraft were in VFR conditions for at least the last 30 seconds prior to impact, and that the Cessna was on a heading of 300 degrees and the Piper on a heading of 190 degrees. He testified that, based upon those assumptions, it would be his opinion that both pilots would have had ample time to see and avoid each other. Critical to Taylor's opinion was the assumption that both aircraft were in VFR conditions for at least the last 30 seconds prior to impact. In its opposition to the motion, however, the government pointed to no evidence to support such an assumption. Moreover, there was no evidence to indicate that the Piper was on a heading of 190 degrees for thirty full seconds prior to the collision; instead, the summary judgment record shows that the Piper was in the process of turning toward a heading of 190 degrees at the time of the collision. This expert opinion given in response to a hypothetical question based upon unsubstantiated factual assumptions is not sufficient to satisfy the government's burden to produce evidence sufficient to support a finding in its favor on an essential element of its case.
 
 
 84
 To summarize, Ahart's estate produced deposition testimony from the government's pilot expert to the effect that the government had no way of proving that pilot Ahart was contributorily negligent. The Ahart estate thus satisfied its threshold burden of identifying the absence of proof on an essential element of the government's affirmative defense of contributory negligence. Pursuant to Fed.R.Civ.P. 56(e), the government, as the non-moving party with the burden of proof at trial on the issue of Ahart's contributory negligence, had the burden of designating "specific facts showing that there is a genuine issue for trial." That burden could have been satisfied by the production of evidence sufficient to support a finding that pilot Ahart was contributorily negligent. The government did not satisfy its burden, and failed to produce any proof that would have allowed a rational, nonspeculative conclusion that pilot Ahart was at least partially at fault in causing this tragic mid-air collision. "A complete failure of proof on an essential element renders all other facts immaterial because there is no longer a genuine issue of material fact." Washington v. Armstrong World Industries, Inc., 839 F.2d 1121, 1122 (5th Cir.1988). We therefore affirm the district court's decision to grant partial summary judgment in favor of Ahart's estate against the government on the issue of contributory negligence.
 
 B
 
 85
 After the ruling on the Ahart estate's motion for summary judgment, Cessna pilot Williams' estate filed a similar motion for partial summary judgment, citing Taylor's testimony and the court's previous ruling on the Ahart estate's motion. In opposition to this motion, the government again attempted to explain Taylor's testimony in context. In addition, the government pointed to the deposition testimony of John Gallipault, Mrs. Ahart's pilot expert. Gallipault testified that, if both aircraft were operating in visual meteorological conditions for thirty seconds prior to the collision, pilot Williams would have had sufficient time to see the Piper Navajo and avoid the collision. Gallipault's opinion was further qualified by assumptions that each aircraft was in a position to see the other, that the pilots' workloads permitted scanning during this time, and that the pilots were looking in each other's direction.
 
 
 86
 In its opposition to the Williams estate's motion, the government also pointed out that its meteorologist, Jerry Hill, testified in his deposition that the base of the clouds in the area where the collision occurred was between 3000 and 3300 feet above mean sea level. The government, relying on Hill's testimony, argued that, because the collision thus occurred well below the clouds at an altitude of approximately 2250 feet above mean sea level, the descending Piper "was in all likelihood flying so as to see and be seen for more than thirty seconds prior to the collision." Furthermore, the government pointed out that, if the clouds at the accident site were at the same height as reported at Addison Airport (about 2650 feet above sea level), then the Cessna operated by Williams was less than 500 feet below the cloud deck when it collided with the Piper, and Williams was thus in violation of the cloud-clearance requirements of 14 C.F.R. Sec. 91.105. The government stated that its expert, Taylor, had agreed with the foregoing in hypothetical form. Pursuant to Sec. 91.105 regulating VFR flight, Williams was under a duty to keep the Cessna 500 feet below, 1000 feet over, or 2000 feet horizontally from, any clouds.
 
 
 87
 Although the record on the Williams estate's motion for summary judgment contains more evidence than the record before the district court on the Ahart estate's motion, we conclude that it does not contain evidence sufficient to support a finding in favor of the government on the issue of whether Williams breached his duty to maintain vigilance so as to see and avoid Ahart's aircraft, or his duty to comply with the cloud clearance requirements of FAR 91.105.
 
 
 88
 The government places strong reliance on its argument regarding the variations in the evidence as to the height of the cloud deck in an attempt to show that there is a genuine issue of material fact. Yet there is no evidence in the summary judgment record as to the speed of either aircraft, such as would be necessary to determine whether the Piper was below the cloud deck (at whatever height that may have been) for as long as thirty seconds prior to the collision. The record likewise contains insufficient evidence to support a nonspeculative finding that Williams may have violated the rules of VFR flight by failing to remain 500 feet below the clouds, because there is no evidence that the clouds at the accident site, which is approximately three miles northwest of Addison Airport, were at the same height as the clouds at Addison Airport. The government's pilot expert, Taylor, testified that the clouds in the area were "broken" or "scattered," and even acknowledged that there may have been no clouds at all in the impact area.
 
 
 89
 We find no merit in the government's argument that the deficiencies in its summary judgment evidence could have been, and allegedly were, cured by further evidentiary development prior to trial, such that an opinion of pilot negligence on the part of at least one of the pilots was inevitable at trial whatever the elevation of the clouds out of which the Piper descended prior to the collision. The government did not utilize the procedure set forth in Fed.R.Civ.P. 56(f) for seeking additional time to obtain evidence opposing a motion for summary judgment. Moreover, the Williams estate's motion for summary judgment was not granted until a little over a week prior to the commencement of the trial, and the government made no attempt to supplement the summary judgment record to include the evidence which it now claims would have precluded summary judgment.
 
 
 90
 For the foregoing reasons, we hold that the district court correctly granted partial summary judgment in favor of the Williams estate on the issue of pilot contributory negligence.
 
 V
 
 91
 * The government argues that the district court's awards for non-pecuniary damages are excessive, and are significantly greater than the amounts traditionally awarded under similar circumstances by the Louisiana courts. According to the government, the district court, without any substantiation or finding of extenuating circumstances, simply awarded the maximum amounts that this court has indicated that it would approve under any set of facts for the loss of a spouse, parent, or child. Although the survivors concede that the trial court did not specify in detail the extenuating circumstances it relied upon in justifying the awards, they contend that the record contains ample evidence to support the awards.
 
 
 92
 (1)
 
 
 93
 The district court held that Louisiana law should be applied to the issue of damages suffered by the Manuel and Ahart survivors. Mrs. Manuel urges us to affirm the district court's award of damages to her by examining the propriety of the amounts awarded in the light of awards for similar losses under Texas law. According to Mrs. Manuel, higher nonpecuniary damage awards are affirmed under Texas law than under Louisiana law, and she contends that we should evaluate her awards in the light of those larger Texas verdicts.
 
 
 94
 Under the Federal Tort Claims Act, the law of the state of the act or omission (including its choice of law rules) applies. Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Mrs. Manuel contends that no real conflict of law existed because both Louisiana and Texas provide for the type of non-pecuniary damages awarded to her in this case and that, therefore, there was no need for the district court to make a choice of law. We disagree. Although damage awards for the loss of love and affection are to be based upon the specific facts of each case, the district court is nevertheless guided by an examination of prior cases involving similar awards for similar losses. Because the maximum amounts affirmed by the Texas courts for such awards exceed the maximum amounts affirmed by the Louisiana courts for similar awards, we find that the district court did not err in holding that there is a conflict. The district court therefore properly analyzed the conflict under Texas choice of law rules.
 
 
 95
 Texas uses the "most significant relationship" test of the Restatement (Second) of Conflicts of Laws to analyze and solve choice-of-laws problems arising in Texas. Duncan v. Cessna Aircraft Co., 665 S.W.2d 414 (Tex.1984). According to the Restatement, the law of the state with the dominant interest in determining the measure of damages in a wrongful death action should be applied. Restatement (Second) of Conflicts of Laws Sec. 175 comment b.
 
 
 96
 Mrs. Manuel contends that the principal interest of Louisiana in having its damages law applied is to insure that its citizens are fairly compensated and do not become a burden on the state. She argues that, because Texas law would allow her to recover greater damages, Louisiana's interest is fully satisfied. Texas, however, has no interest in the amount of wrongful death damages awarded to Louisiana residents. Mr. Manuel and Mr. Ahart were both residents of Louisiana at the time of their deaths, their survivors are residents of Louisiana, and the survivors received benefits under the Louisiana workers' compensation laws. We therefore hold that the district court correctly determined that Louisiana damages law should apply to the damages issues involving the Ahart and Manuel survivors.
 
 
 97
 (2)
 
 
 98
 Now comes the chore of reviewing the damages awarded for the loss of love, affection, and guidance. "The loss of a loved one is not measurable in money. Human life is, indeed priceless. Yet the very purpose of the lawsuit for wrongful death is to fix damages in money for what cannot be measured in money's worth." Caldarera v. Eastern Airlines, Inc., 705 F.2d 778, 784 (5th Cir.1983). When we discuss the loss of love in terms of money, we feel more than a little ghoulish in engaging in such surreal exercises. This fiction of reducing love to a monetary figure is a difficult and distasteful task for a court. If we cut back the amount of damages, we are accused of insensitivity, cynicism, or denigration of the marriage and family relationships. Yet it is a legal fiction that money can ever compensate for the loss of the intensely personal and wholly unmaterialistic relationship of love. Thus, to the charge that cutting such awards is insensitive to the pain suffered in the loss of a loved one, we can only say, with the most profound respect for the relationship and the most profound sorrow for its loss, that the first principle upon which these damages rest, that is, that money can, even in the most remote way, compensate for love, is flawed to its roots. Thus we start our review of the damages from the viewpoint that one hundred times the amount of the award is no compensation for the loss at issue. It therefore follows that if the money awarded for love is reduced it does not detract from the irreplaceable loss of the love, affection, and companionship of the decedent.
 
 
 99
 Nonpecuniary damages that may be claimed for wrongful death under Louisiana law "include both the loss of the decedent's love and affection and the grief and mental and physical anguish suffered by the survivor." Domangue v. Eastern Airlines, Inc., 542 F.Supp. 643 (E.D.La.1982), rev'd in part on other grounds, 722 F.2d 256 (5th Cir.1984); Diefenderfer v. Louisiana Farm Bureau Mutual Ins. Co., 383 So.2d 1032 (La.App.1980). Because Louisiana law does not permit separate awards for the loss of love and affection and for grief and mental anguish, we will refer to this element of damages as "love and affection." See Croce v. Bromley Corp., 623 F.2d 1084, 1095 (5th Cir.1980). Under Louisiana law, such awards are "subjective and discretionary." Comberrel v. Basford, 550 So.2d 1356 (La.App.1989); LSA-CC art. 1999. Louisiana courts consider the closeness and congeniality of the family relationship as well as the grief suffered by the survivors in determining the proper award for such losses. E.g., Blancher v. Samuels, 354 So.2d 213 (La.App.) (on reargument), writs denied, 355 So.2d 257, 263 (La.1978); Dyson v. Gulf Modular Corp., 345 So.2d 1222, 1225 (La.App.1977).
 
 
 100
 The district court awarded Mrs. Ahart $500,000 for the loss of love and affection of her husband. Mr. Ahart's three children each received $250,000. Mrs. Manuel was awarded $500,000 for the loss of love and affection of her husband and $500,000 for the loss of love and affection of her five-year-old daughter. The only justification given by the district court for these awards is as follows:
 
 
 101
 The testimony presented shows that the Ahart family was a close-knit family, with Steven R. Ahart taking an active role in the care and raising of his children. The Court must take this into account in determining the amounts to be awarded to Cynthia Ahart, Michael Steven Ahart, Haley Brooke Ahart, and Steven J. Ahart for their loss of the affection, love and guidance of Steven R. Ahart.
 
 
 102
 ....
 
 
 103
 The Court must next determine damages to Brenda Manuel for the loss of her husband, and her daughter, Renee Manuel. The Court finds that given the circumstances of the accident and the loss of love, affection and support of her husband, Brenda Manuel is entitled to be compensated for this loss in the amount of $500,000. For the loss of her five year old daughter, Renee, the Court determines that a like amount of $500,000 for the loss of love and affection of Renee Manuel.
 
 
 104
 The government correctly notes that these awards for non-pecuniary damages either exceed or are barely within maximum amounts which this court has indicated that it would affirm for similar losses. See Marks v. Pan American World Airways, Inc., 785 F.2d 539 (5th Cir.1986); In re Aircrash Disaster Near New Orleans, 767 F.2d 1151 (5th Cir.1985); Winbourne v. Eastern Airlines, Inc., 758 F.2d 1016 (5th Cir.1984), cert. denied, 474 U.S. 1036, 106 S.Ct. 603, 88 L.Ed.2d 582 (1985); Haley v. Pan American World Airways, Inc., 746 F.2d 311 (5th Cir.1984); Caldarera v. Eastern Airlines, Inc., 705 F.2d 778 (5th Cir.1983).
 
 
 105
 The damage awards in this case are reviewed under the clearly erroneous standard of Fed.R.Civ.P. 52(a). Caldarera, 705 F.2d at 783; Wheat v. United States, 860 F.2d 1256, 1259 (5th Cir.1988). The question whether to reduce an award is one which cannot be answered "entirely by rational analysis. It is inherently subjective in large part, involving the interplay of experience and emotions as well as calculation." Caldarera, 705 F.2d at 784. This court has previously noted that
 
 
 106
 Because the assessment of damages for grief and emotional distress is so dependent on the facts and is so largely a matter of judgment, we are chary of substituting our views for those of the trial judge. He has seen the parties and heard the evidence; we have only read papers.
 
 
 107
 Id. at 783. Nevertheless, "[u]nless we are to accept any verdict, in whatever amount, as a legally acceptable measure, we must review the amount ... a trial court awards.... The sky is simply not the limit." Id. at 784.
 
 
 108
 Unfortunately, with one exception, we are unable to conduct a meaningful review of the damage awards for loss of love and affection in this case. The trial court recited no facts or extenuating circumstances, and gave no rational explanation or justification for the large awards in this case. Although we have approved the practice of examining past awards for similar losses for guidance in making these types of awards, we have also made it clear that these awards must be based on the facts and circumstances of the particular case. See, e.g., Wheat, 860 F.2d at 1259. Our affirmance of awards of $500,000 for the loss of a spouse and $250,000 for the loss of a parent or child in past cases was never intended to mean that awards in identical amounts could be awarded with impunity, without fear of reversal, in all future cases, regardless of the facts.
 
 
 109
 Our review of the record in this case sheds very little, if any, light on the possible reasons that could justify the large awards for loss of love and affection in this case, and we cannot attempt to review the awards with only conjecture and speculation as our guide. For example, each of the widows received $500,000 for the loss of the love and affection of their husbands. The evidence reveals that both widows were happily married, but their respective reactions to their losses were markedly different. The district court, however, made no distinction. Although an argument can be made that Mrs. Manuel suffers inwardly, while Mrs. Ahart's suffering is more visible, such an argument is purely speculative. There may very well be reasons why the district court thought that the grief suffered by each of the widows was identical, but we cannot discern any such reasons from our review of the record, and no such reasons were articulated by the district court.
 
 
 110
 We have noted that awarding damages for such losses is an extremely difficult task. Courts are timorous, for example, to say to widows before the court, "the love of this husband is a greater loss than the love of that husband." Nevertheless, automatic comparisons are unconvincing, and that is why these awards need specific, cogent, and convincing reasons to justify them. It takes a very special, unique, symbiotic relationship, the loss of which is likely to leave, after the ordinary time of grief, an emptiness that results in long-lasting emotional devastation, to justify the maximum amounts that we have approved in past cases for these types of losses. Although the trial court's discretion in awarding damages is broad, that discretion is not boundless. The district judge, who was in the courtroom and had an opportunity to observe the witnesses, articulated no reasons to support the identical awards to the two widows. Because our review of the record reveals no such reasons, we cannot conduct a meaningful review of those awards.
 
 
 111
 The district court also awarded $250,000 each to Michael Steven Ahart and Haley Brooke Ahart, the minor children of Mr. and Mrs. Ahart, for the loss of their father, and awarded $250,000 to Steven J. Ahart, Mr. Ahart's son by his former marriage. The district court awarded all three children identical amounts regardless of their different ages and the fact that one child was not and had not been living with his father. "Under Louisiana law, amounts recoverable in a wrongful death action for loss of care, guidance, and affection of the deceased may differ among the plaintiffs on the basis of differing degrees of affection which existed between the deceased and the different plaintiffs, or differing degrees of guidance needed by minor plaintiffs." Mergen v. Piper Aircraft Corp., 524 So.2d 1348, 1354 (La.App.1988). The district court did not give any reason for its award of identical damages to the three children, and our review of the evidence reveals no such reason.
 
 
 112
 Finally, the district court awarded Mrs. Manuel $500,000 for the loss of her five-year-old daughter. Nothing in the record, nor in the opinion of the district court, suggests why the award for the loss of the minor child should be double the highest amount this court has ever approved for the loss of a child. Our review of the record reveals that Mrs. Manuel is of an age that makes it unlikely that she will have other children. In this tragic collision, she lost her husband and her only child, who were her entire family. We conclude that, given the particular facts of this case, and under these exceptional and extraordinary circumstances, the maximum amount that could have been properly awarded for Mrs. Manuel's loss of the love and affection of her daughter is $250,000.
 
 
 113
 Reducing the amount to $250,000, we affirm the judgment against the United States in favor of Mrs. Manuel for the loss of the love and affection of her daughter. We vacate the portion of the district court's judgment awarding damages to Mrs. Manuel and Mrs. Ahart for the loss of the love and affection of their husbands, and the portion of the judgment awarding damages to Ahart's three children, and remand this case to the district court for reconsideration of the amounts of damages that should be awarded under the particular facts of this case. The district court's findings of fact should include precise reasons and a cogent explanation in justification of the amounts awarded.
 
 B
 
 114
 The government argues that the district court also erred in its calculation of pecuniary loss awards.
 
 
 115
 (1)
 
 
 116
 The government argues that the district court erred in adopting the methodology used by Mrs. Ahart's economist for calculating the present money value of future economic losses sustained by the Manuel and Ahart survivors. The government's objection is based upon the economist's failure to follow the below-market discount rate methodology set forth in Culver v. Slater Boat Co., 722 F.2d 114 (5th Cir.1983) (Culver II). Although the economist testified that he utilized the Culver II methodology, our review of his testimony reveals that he did not strictly adhere to Culver II.
 
 
 117
 In Lucas v. United States, 807 F.2d 414 (5th Cir.1986), an FTCA case, this court affirmed an award based on calculations of an economist who used the total offset method. The court noted that it had rejected the total offset method in cases applying substantive federal law, citing Culver II, and noted that the government had cited no Texas law rejecting the total offset approach. In Ageloff v. Delta Airlines Inc., 860 F.2d 379, 389 (11th Cir.1988), the Eleventh Circuit held that Culver II did not apply to damage recoveries in diversity cases.
 
 
 118
 We conclude that the district court was not bound to follow Culver II in this FTCA case. The government has pointed to no Louisiana law rejecting the approach used by the Ahart economist. Based upon the record before us, we cannot say that the district court committed reversible error in adopting the economist's methodology for reducing the future losses to present value.
 
 
 119
 (2)
 
 
 120
 The district court awarded Mrs. Ahart $437,155 as the present money value of future wage losses sustained as a result of Ahart's death. The government contends that there is an insufficient factual basis for the economist's including in his projection of future wages a $4,000 raise Ahart possibly would have received if he had been promoted to "captain." The economist's information was taken from a letter written by the president of Standard Fittings, Ahart's employer, stating that "if" Standard continued "heavy operations of jets," then "possibly" Ahart would have been promoted to captain. The economist conceded that he had no information to substantiate the likelihood of Standard continuing heavy jet operations or the "possibility" of Ahart being promoted if it did continue such operations, and we find no such evidence in the record. We therefore conclude that the $4,000 raise that Ahart "possibly" would have received is too speculative to be the basis of a legitimate calculation of his lost income stream. The economist testified that if his calculation regarding economic loss did not include the added $4,000 income Ahart would earn if he were promoted to captain, the economic loss figure would have to be reduced from $437,155 to $377,638. We conclude, therefore, that $377,638 is the amount of damages that will compensate for earnings lost as a result of Ahart's death.
 
 
 121
 (3)
 
 
 122
 The district court awarded Mrs. Ahart $96,423 for the loss of the benefit of a company vehicle that was used by Ahart in conjunction with his employment with Standard Fittings. The vehicle, a 1979 or 1980 Chevrolet van, was owned by Standard, and Standard paid for the maintenance, fuel, and insurance. The award was based upon the calculations of Mrs. Ahart's economist, who relied upon his review of an unspecified trade magazine that supposedly indicated that the overall cost to maintain a new car was in the neighborhood of $5,000 per year. The economist assumed that the car would be replaced every three to four years and would be used approximately 10,000 miles a year. The economist admitted that his calculation was based on the "cost to replace a car over that period of time," and not on the amount of loss suffered by Mrs. Ahart. Mrs. Ahart testified that the van was occasionally used for family outings, and that she occasionally used the van in her employment; however, she had a family car for her own use. She conceded that the van was provided by Standard for her husband's exclusive use and that he was to use it for work. The district court therefore clearly erred in awarding Mrs. Ahart $96,423 for the loss of the benefit of the van since the loss of the van on the rare occasions that she used it did not deprive her of any economic benefit to which she was entitled. In the absence of any evidence in the record from which a nonspeculative calculation of her loss, if any, can be made, the award to Mrs. Ahart for the loss of use of the van is stricken.
 
 
 123
 (4)
 
 
 124
 The district court awarded Mrs. Ahart $11,605 for post-accident psychological care. The government argues that, under Louisiana law, a separate award for psychological care is not authorized where a plaintiff has already received an award for grief, loss of companionship, etc. The government's argument is supported by Lang v. Prince, 447 So.2d 1112, 1119-20 (La.App. 1st Cir.1984) and Meyers v. Smith, 482 So.2d 60, 63-64 (La.App. 5th Cir.1986). At oral argument, Mrs. Ahart's counsel called our attention to another Louisiana Court of Appeal case, Jones v. Payton, 548 So.2d 1260 (La.App. 4th Cir.1989). In that case, the court held that an award of $30,000 for future psychological treatment of a child who witnessed his mother's death, and also suffered injuries in the same accident, was not an abuse of discretion. The Jones court did not cite any authority for that portion of its decision, and did not attempt to distinguish the previous Louisiana cases holding to the contrary. Nor did the Jones court indicate whether the $30,000 was part of the award for the injuries suffered by the child in the accident, or was an element of the wrongful death damages.
 
 
 125
 We therefore conclude that Lang v. Prince establishes the correct principle of Louisiana law with regard to special damages for psychological care in a wrongful death action. Because such special damages are not recoverable under Louisiana's wrongful death statute when a general award that includes compensation for grief is given, the district court clearly erred in awarding Mrs. Ahart $11,605 for post-accident psychological treatment. We therefore conclude that Mrs. Ahart's award should be reduced by that amount.
 
 
 126
 (5)
 
 
 127
 The district court awarded Sandra Dugal (Ahart's former wife) $8,898 for the loss of child support paid to her by Ahart for the support of their ten-year-old son. She also received on behalf of their son $4200 for the value of lost flying lessons that Ahart would have given his son, and $25,733 for college tuition that Ahart promised to pay. This $38,381 would obviously have come from Ahart's earnings had he lived. In projecting future economic losses, however, the Ahart economist allocated all of Ahart's net income (minus his personal consumption) to the support of the second Mrs. Ahart and their two children, and the district court adopted the economist's calculations without making any deduction for the amount that would have been spent to support his son by his former wife. The district court thus clearly erred in not reducing the award to Mrs. Ahart for lost earnings by $38,381, which he would have paid to his first wife, Sandra Dugal, for the support of their son. We therefore affirm the award of $38,381 to Sandra Dugal and reduce the award to Mrs. Ahart by that amount.
 
 
 128
 (6)
 
 
 129
 The district court awarded Mrs. Manuel $189,175.47 for loss of support from her husband's projected future income. The court did not apply the methodology for calculating damages suggested by Mrs. Manuel's economist, but instead used the same six percent wage growth rate and 7.75% discount rate used by Ahart's economist. There is no merit to the government's argument that the district court's calculations are suspect because it mingled the Manuel economist's calculations (which were based on a work-life expectancy to age 70) with the wage growth and interest rate figures used by the Ahart economist. We affirm this award.
 
 
 130
 (7)
 
 
 131
 The district court also awarded Mrs. Manuel $156,717.04 for lost income from bartering. The award was based on the Manuel economist's calculations, using a base bartering income of $5,272 (as reflected on the Manuels' amended 1982 income tax return), and a growth rate in that income of 4.3% a year, projected over a period of years ending with Manuel's seventieth birthday. The government contends that there was insufficient evidence to support the $5,272 base for projecting lost bartering income, and we agree.
 
 
 132
 Mrs. Manuel prepared the family tax returns. None of the returns filed prior to Manuel's death indicated any income from bartering. In 1983, after Manuel's death, and after she had retained her attorneys in this case, Mrs. Manuel filed amended returns showing bartering income of $5,272 in 1982. When questioned about her amended returns during her deposition, however, Mrs. Manuel stated that her husband bartered very infrequently, and that the most her husband ever made from bartering in any given year was between $300 and $400. At trial, she testified that she had gone through her records and was able to document the income from bartering. When questioned as to the manner in which she calculated the figure of $5,272 as bartering income in 1982, Mrs. Manuel testified that she was initially unaware of the value of the bartered property. She testified that she did not refer to any notes or records prepared at the time the items were bartered for when she amended the tax returns, and that her lawyers gave her the document from which she placed a value on the bartered items. On redirect examination at trial, Mrs. Manuel, when questioned about the source of the information for the bartered items, testified that she got some of the information from her husband, and that she didn't really remember where she got the rest of the information. The $5,272 figure was composed of the following items:
 
 
 133
 There is no evidence in the record as to what particular services Mr. Manuel performed, or for whom those services were performed, in exchange for the bartered items. No income from bartering was reported for any year other than 1982. We do not cast any aspersions on Mrs. Manuel's honesty and integrity, nor do we make any credibility judgments. We simply hold that, on the basis of the evidence in the record before us, the award for lost bartering income is unsubstantiated and speculative. The $5,272 base for projecting the loss is not supported by the evidence. The Manuels reported no bartering income in the years prior to 1982, and there is no evidence in the record to support a finding that Wayne Manuel would continue to earn income from bartering in the future, much less until age 70, or that the amount of such income, if any, would increase at a rate of 4.3% per year. Mrs. Manuel's award is therefore reduced by $156,717.04.
 
 VI
 
 134
 To conclude we summarize. We affirm the partial summary judgments in favor of the pilots' estates on the issue of pilot contributory negligence. We reverse the partial summary judgment in favor of the United States with respect to the claims of the Williams estate on behalf of Williams' surviving widow and daughter, and remand that claim for further proceedings.
 
 
 135
 With the exception of the award to Brenda Manuel for the loss of the love and affection of her daughter, which we affirm, as reduced to $250,000, the portion of the district court's judgment awarding damages for the loss of love, affection, and guidance is vacated, and the cause is remanded to the district court for reconsideration of those awards.
 
 
 136
 We affirm the judgment against the United States in favor of Mrs. Ahart as to the following amounts (as reduced):
 
 
 137
 Loss of earnings (wages) $339,257.00
Hospitalization 31,125.00
Pension plan 6,555.00
Funeral expenses 4,317.99
Personal services 30,381.00
 
 
 138
 We affirm the judgment against the United States in favor of Mrs. Manuel as to the following amounts (as reduced):
 
 
 139
 Loss of love and affection of Renee Manuel $250,000.00
Loss of earnings 189,175.47
Lost household services 6,137.10
Funeral expenses 7,183.72
 
 
 140
 We affirm the judgment against the United States in favor of Sandra Dugal in the amount of $38,381.
 
 
 141
 The government did not challenge the award of funeral expenses to the Williams estate or the awards to the insurers, and all of those awards are affirmed in all respects. AFFIRMED IN PART; REVERSED IN PART; AND VACATED IN PART AND REMANDED.
 
 
 
 *
 Circuit Judge of the Sixth Circuit, sitting by designation
 
 
 [1]
 Garlic? Apparently Manuel was an excellent cook in the south Louisiana tradition, often cooking for friends and neighbors, and would not have had much difficulty in using $250 worth of garlic over a year's period of time. However, we are not told what particular services were rendered in exchange for the garlic
 
 
 [200]
 pounds of aluminum $700
Trolls 700
Drill press 125
Band saw 250
8 cases of wine 864
Liquor 28
Restaurant supplies 75
Iron toolbox and jacks 600
Tape deck 175
Cassette and radio 150
Ten boxes of ribeyes $400
Six boxes of lobster 390
Six boxes of shrimp 240
Three boxes of chicken 90
Ten pounds of crawfish 90
Wood paneling 100
Garlic 250[1]
1. Garlic? Apparently Manuel was an excellent cook in the south Louisiana
traditioon, often cooking for friends and neighbors, and would not have had
much difficulty in using $250 worth of garlic over a year's period of time.
However,, we are not told what particular services were rendered in exchange
for the garlic.