### In re GREENWOOD AIR CRASH.

#### No. IP 93–9446–C–T/F.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Feb. 3, 1995.

---

Robert E. Badger, Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, DC, Jeffrey L. Hunter, Asst. United States Attorney, Indianapolis, IN, for U.S.

Richard M. Malad, Cohen & Malad, Indianapolis, IN, for June Bennett/Julie Bennett.

Patricia McCrory, Harrison Moberly, Indianapolis, IN, for State Farm Insurance.

Steven E. Springer, Kightlinger & Gray, Indianapolis, IN, J. David Hollingsworth, Hollingsworth & Meek, Indianapolis, IN, for Solar Sources, Inc.

Stephen E. Arthur, Bose McKinney & Evans, Indianapolis, IN, Kenneth D. Ross, Ross & Harrington, Chicago, IL, for Control Systems Engineering/June Bennett.

Patrick M. Graber, McCullough Campbell & Lane, Chicago, IL, Richard D. Wagner, Krieg Devault Alexander & Capehart, Indianapolis, IN, for Carol Mullen.

## ENTRY FOLLOWING TRIAL

TINDER, District Judge.

Trial was held in this matter on July 17–20, and 24–26, 1995. The only issue at trial was the allocation of. fault among the two pilots and the air traffic controller, the Plaintiffs and Defendants having previously reached a resolution of their claims, the details of which are unknown to the court. That resolution settled the Plaintiffs' claims against Defendants as a group. These findings and conclusions will determine the proportional responsibility of each Defendant. It is the court's understanding that these determinations will then trigger the Defendant's relative responsibilities to contribute to the settlement fund. The Defendants indicated that within ten days after the issuance of this entry, they will submit a proposed final order which will effectuate the settlement agreement and constitute a final judgment and disposition in this and all related matters pending in this court.

After reviewing all the testimony and exhibits presented at trial, the following Findings of Fact and Conclusions of Law are now issued pursuant to Rule 52 of the Federal Rules of Civil Procedure.

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I. STIPULATED MATTERS

The parties stipulated to the following facts [1] and matters of law which the court adopts and incorporates herein:

### A. JURISDICTION

1.1 Federal jurisdiction is based upon the fact that the United States of America is a named party defendant. The cases in this consolidated action were initially filed in State Court and were removed to Federal Court by the United States. This action arises under 28 U.S.C. § 2671 *et seq.* (Federal Tort Claims Act). The court has original jurisdiction over the claims against the Defendant, United States of America, under 28 U.S.C. § 1346. Pursuant to 28 U.S.C. § 1367, this court has supplemental jurisdiction over the claims against the private defendants.

1.2 The claims of each Plaintiff and the Defendant, Solar Sources, Inc., against the United States of America were timely submitted to the Federal Aviation Administration, were rejected by the Federal Aviation Administration and suit was filed by each Plaintiff and the Defendant, Solar Sources, Inc., within the time required by law.

### B. THE INCIDENT

2.1 On September 11, 1992, a midair collision involving two aircraft occurred approximately two miles northeast of the Greenwood Airport, Greenwood, Indiana.

2.2 The collision resulted in the death of six people, severe injuries to two people, loss of both aircraft, and damage to real and personal property on the ground.

### C. THE AIRCRAFT

3.1 The collision involved a Mitsubishi MU–2B–60 Marquis aircraft, identification number N 74 FB (hereinafter "MU–2"), and a Piper PA–32–301 Saratoga identification number N82419 (hereinafter "Saratoga").

3.2 The MU–2 was a high-wing, twin-engine, turboprop passenger aircraft. It could be configured to seat from six to nine persons.

3.3 The MU–2 was 39 feet 5 inches long and had a wing span of 39 feet 2 inches and a height of 13 feet 8 inches.

3.4 The Saratoga was a low-wing, six-passenger, single-engine aircraft.

3.5 The Saratoga was 27 feet 8 inches long and had a wing span of 36 feet two inches and a height of 8 feet 2 inches.

3.6 The MU–2 was owned by Solar Sources, Inc., an Indiana Corporation.

3.7 The Saratoga was owned by Control Systems Engineering, Inc., ("Control Systems"), an Indiana Corporation.

3.8 The Saratoga was painted light gray with black and red trim.

3.9 The MU–2 was painted white with silver and blue trim.

3.10 Both aircraft were properly licensed and maintained at the time of the accident.

3.11 The Saratoga was customarily based at Eagle Creek Airport.

3.12 The MU–2 was customarily based in Huntingburg, Indiana, which was the home town of pilot William Mullen ("Mullen").

---

**1.** Although not relevant to the court's findings, the parties also stipulated that David Fritz suffered from seasonal hayfever and that following the collision, David Fritz was asked by National Transportation Safety Board investigators to submit a bodily fluids sample and refused.

They also stipulated that the Andrews studies reflected in Deposition Exhibits 168, 169, 170 and 171 are true and accurate copies of the project reports prepared for the Federal Aviation Administration by the Lincoln Laboratory, MIT. The FAA has made such reports available to the public.

## D. THE PILOTS

4.1 At all relevant times, the Saratoga was piloted from the left seat by William Bennett ("Bennett").

4.2 At all relevant times the MU-2 was piloted from the left seat by Mullen.

4.3 Both of the pilots were qualified to pilot the aircraft in accordance with applicable Government regulations.

4.4 Mullen was qualified to operate the MU-2 aircraft.

4.5 There was no regulatory requirement for two pilots of the MU-2 for the flight in question.

## E. THE WEATHER

5.1 Relevant weather observations at the Indianapolis International Airport, which is about thirteen miles northwest of the accident location, were as follows:

A. Time: 1450 CDT (2:50 P.M.); cloud bases: 4,500 feet scattered; [25,000] feet scattered; visibility 15 miles; temperature 70 degrees fahrenheit, dew point 49 degrees fahrenheit; wind 020 degrees at 10 knots; altimeter 30.29 inches Hg.

B. Time: 1504 CDT (3:04 P.M.); cloud bases: 4,500 feet scattered; visibility 15 miles; temperature 68 degrees fahrenheit, dew point 48 degrees fahrenheit; wind 050 degrees at 5 knots; altimeter 30.18 inches Hg.

C. Time: 1550 CDT (3:50 P.M.); cloud bases: 4,500 feet scattered; visibility 15 miles; temperature 71 degrees fahrenheit, dew point 47 degrees fahrenheit; wind [340] degrees at 4 knots; altimeter 30.28 inches Hg.

5.2 At the time of the accident, the position of the sun relative to the accident site was approximately 230 degrees (true azimuth) and 43 degrees in elevation.

## F. GREENWOOD AIRPORT

6.1 The Greenwood Airport is an uncontrolled, non-towered airport. At the time of the collision, the Airport consisted of a single north/south runway approximately 3,462 feet in length.

6.2 Airplanes taking off to the north from the Greenwood Airport would use runway 36, and planes taking off to the south would then use runway 18.

6.3 These numbers reference to the abbreviated compass heading for the runway (i.e., north is 360 degrees on the compass or 36; south is 180 degrees on the compass or 18).

6.4 The Greenwood Airport was equipped with a common traffic advisory frequency of 123.0 (CTAF/UNICOM) which was capable of being monitored by the fixed base operator.

6.5 In order for an aircraft to get to the south end of runway 36, it was necessary to back taxi (taxi the aircraft in the direction opposite to the direction of its intended takeoff) approximately one-half of the length of the runway.

6.6 The field elevation of the Greenwood Municipal Airport was 822 feet above mean sea level.

## G. INDIANAPOLIS TRACON

7.1 Located at Indianapolis International Airport are the Federal Aviation Administration equipment and personnel that provide terminal control services to pilots and aircraft. This facility is known as Indianapolis Terminal Radar Approach Control commonly referred to as INDTRACON.

7.2 At all times relevant to this accident, the following air traffic control positions were staffed as indicated:

A. Indianapolis Radar Approach Control Departure Combined Satellite West (commonly referred to as INDTRACON—W); Sally Cousar

B. Indianapolis Radar Approach Control Departure Combined Satellite East (commonly referred to INDTRACON—E); David Fritz

7.3 The air traffic controllers ("ATC"), Sally Cousar and David Fritz ("Fritz"), were stationed at radar/computer consoles which were part of the air traffic control system known as ARTS IIIA.

7.4 Fritz was, on September 11, 1992, an employee of the United States working in the capacity of a full performance level (FPL) air traffic controller at the INDTRACON.

7.5 The radar antenna which provides information to the ARTS IIIA computer is located at latitude 39°–43′–43.31″ N and longitude 86°–17′–10.38″ W.

7.6 The antenna which receives the beacon code information for the TRACON rotates once approximately every 4.7 seconds.

7.7 Both ATCs had available to them primary (actual) radar information.

7.8 Both ATCs had available to them secondary (computer-generated) target information.

7.9 The Air Traffic Control Manual, Federal Aviation Administration Order 7110.65G ("Manual"), states procedures to be followed by air controllers. That publication, at all times relevant stated:

*2.2 Duty Priority*

a. Give first priority to separating aircraft and issuing safety alerts as required in this order. Good judgment shall be used in prioritizing all other provisions of this order based on the requirements of the situation at hand. 2.2 a Note—Because there are many variables involved it is virtually impossible to develop a standard list of duty priorities that would apply uniformally to every conceivable situation. Each set of circumstances must be evaluated on its own merit, and when more than one action is required, the controller shall exercise his best judgment based on the facts and circumstances known to him. That action which is most critical from a safety standpoint is performed first.

b. Provide additional services to the extent possible, contingent only upon higher priority duties and other factors including limitations of radar, volume of traffic, frequency congestion, and work load. 2.2 b Note—The primary purpose of the ATC system is to prevent a collision between aircraft operating in the system and to organize and expedite the flow of traffic. In addition to its primary function, the ATC system has the capability to provide (with certain limitations) additional services. The ability to provide additional services is limited by many factors, such as the volume of traffic, frequency congestion, quality of radar, controller workload, higher priority duties, and the pure physical inability to scan and detect those situations that fall in this category. It is recognized that these services cannot be provided in cases in which the provision of services is precluded by the above factors. Consistent with the aforementioned conditions, controllers shall provide additional service procedures to the extent permitted by higher priority duties and other circumstances. The provision of additional services is not optional on the part of the controller, but rather is required when the work situation permits.

*2.6 Safety Alert*

Issue a safety alert to an aircraft if you are aware the aircraft is at an altitude which, in your judgment, places it in unsafe proximity to terrain, obstructions, or other aircraft. Once the pilot informs you action is being taken to resolve the situation, you may discontinue the issuance of further alerts. Do not assume that because someone else has responsibility for the aircraft that the unsafe situation has been observed and the safety alert issued; inform the appropriate controller.

2.6 Note 1.—The issuance of a safety alert is a first priority (See § 202) once the controller observes and recognizes a situation of unsafe aircraft proximity to terrain, obstacles, or other aircraft. Conditions, such as workload, traffic volume, the quality/limitations of the radar system, and the available lead time to react are factors in determining whether it is reasonable for the controller to observe and recognize such situations. While a controller cannot see immediately the development of every situation where a safety alert must be issued, the controller must remain vigilant for such situations and issue a safety alert when the situation is recognized.

7.10 Prior to the collision, no one working for the FAA issued any traffic advisories or safety alerts to the pilots of the MU–2 or the Saratoga.

7.11 Following the collision, the data in the ARTS IIIA computer was preserved.

## H. FLIGHT OF THE PIPER SARATOGA

8.1 The Saratoga departed Eagle Creek Airport with Mark Doucey in the right front seat and Julie Bennett in one of the rear seats of the aircraft at approximately 1300 CDT (1:00 P.M.).

8.2 The Saratoga flew from Eagle Creek Airport to Terry Airport, which is approximately 14 miles northwest of Indianapolis International Airport and landed at approximately 1330 CDT (1:30 P.M.).

8.3 While on the ground at Terry Airport, Mr. Bennett talked with Dan Montgomery about maintenance service on the Saratoga.

8.4 The Saratoga departed Terry Airport to the North on runway 36 and Bennett advised the INDTRACON–W controller (Sally Cousar) that he had departed the Terry Airport and that he was going to Greenwood.

8.5 Both parties agree that the times recorded in the ARTS IIIA computer are incorrect. However, the parties quantify the discrepancy differently.

8.6 The times, as reflected in the radio transcript (Exhibit 27), are coded and recorded directly from the National Time Standard Broadcast over station WWV. The times recorded in the ARTS IIIA computer are not tied to any external time source and on September 11, 1992, near the time of collision, were not synchronized with WWV time and/or with the time reflected in the radio transcript.

8.7 The departure west satellite controller issued a discrete beacon transponder code to the Saratoga 0301. The pilot of the Saratoga asked permission to climb to 2500 feet, which the controller approved.

The following transmission took place at the F.A.A.'s radio transcript time indicated:

| 1946:11 | N82419 | Ah four one nine two thousand yeah we'd like to go to twenty five hundred just to go across there |
|---|---|---|
| 1946:15 | INDTRACON—W | November four one niner roger climb and maintain two thousand five hundred. |
| 1946:17 | N82419 | Ah four one nine affirmative two thousand five hundred. |

8.8 According to the FAA radio transcript, at approximately 1451:17 CDT (1951:17 UTC) the INDTRACON–E controller (Fritz) accepted control of the Saratoga from the INDTRACON–W controller (Sally Cousar).

8.9 At the transcript times indicated the following transmissions took place between the Saratoga pilot and the INDTRACON–E controller (Fritz):

1955:51 INDTRACON–E: Cessna four er Cherokee four one nine the airport twelve to one o'clock there and three miles.

1955:55 N82419: A four one nine we have the airport.

1955:57 INDTRACON–E: November four one nine roger surface winds at Indianapolis zero two zero at eight squawk VFR radar service terminated frequency change approved.

1956:03 N82419: Ah four one nine thank you very much.

1956:05 INDTRACON–E: Roger.

8.10 Radar data retrieved from the ARTS IIIA system shows that the Saratoga pilot changed his transponder code from 0301 to 1200, the universal VFR transponder code.

8.11 Thereafter, the Saratoga commenced a descent from 2,500 feet MSL (mean sea level) and continued its heading of approximately 170°.

## I. FLIGHT OF THE MU–2

9.1 Use of the MU–2 was provided by Solar Sources, Inc. at no charge for a trip from Greenwood, Indiana, to Columbus, Ohio. The purpose of the trip was to fly four

Indianapolis civic leaders to visit the Ameriflora display in Columbus, Ohio and return to Indianapolis on the same day. These four individuals were Mike Carroll, Frank McKinney, Jr., Robert Welch, and John Weliever. The trip was being made to obtain information which might have been useful to the White River State Park Commission in its effort to create and beautify the White River State Park.

9.2 The MU–2 was often flown by Mullen in and out of the Greenwood Airport which is close to the corporate offices of Solar Sources, Inc.

9.3 Prior to departing Huntingburg, Indiana, Mullen filed two instrument flight plans with the Terre Haute flight service station (FSS) in Terre Haute, Indiana, at approximately 12:08 CDT.

9.4 The first flight plan was for a flight from Huntingburg, Indiana, to Greenwood, Indiana, listing an estimated departure time of 1300 CDT and an estimated arrival time at Greenwood at 1330 CDT (1:00 and 1:30 P.M. respectively).

9.5 The second flight plan filed by Mr. Mullen concerned the flight from Greenwood, Indiana, to Columbus, Ohio, and listed an estimated departure time of 1400 CDT (2:00 P.M.) and an estimated arrival time at Columbus, Ohio of 1445 CDT (2:45 P.M.).

9.6 Mr. Mullen and his four passengers boarded the MU–2 and Mr. Mullen taxied the MU–2 to the south end of Runway 36 at Greenwood prior to departure.

9.7 Mr. Mullen was heard to announce on the CTAF/UNICOM frequency that he was back taxiing on Runway 36.

9.8 After lift off, Mr. Mullen retracted the landing gear of the MU–2.

9.9 After lift off, Mr. Mullen retracted the flaps from their initial 20° position to a 5° position and then to 0°.

9.10 As he departed Greenwood, Mr. Mullen in the MU–2 executed a right turn to the east.

9.11 Mr. Mullen initiated contact with the INDTRACON–E controller (Fritz) on frequency 124.95 at which time the following transmissions occurred according to the FAA radio transcript:

1956:41 N74FB: Indy approach Mitsubishi seven four foxtrot bravo over.

1956:45 INDTRACON—E: Mitsubishi seven four fox bravo Indy.

1956:47 N74FB: Roger I'm off the ground Greenwood standing by for clearance to Columbus.

1956:51 INDTRACON—E: Seven four fox bravo roger squawk [2] four five six four and ident maintain uh at or below five thousand.

9.12 Following the instructions of Indianapolis Departure Control, Mr. Mullen set his transponder to the discrete code 4564. The transponder control panel on a Mitsubishi MU–2B 60 aircraft is located on the right side of the center instrument control panel.

9.13 Pilot Mullen had no way to anticipate the code setting "4564" prior to it being assigned to him by air controller Fritz.

9.14 Any beacon code return "4564" near the time of the subject collision and near the vicinity of Greenwood Airport on September 11, 1992 was associated with the MU–2 aircraft.

9.15 The data reported in deposition Exhibit 230 reflects the highest confidence or validity factor by the computer. No other relevant "4564" codes are recorded in Exhibit 230 and/or in the beacon target reports.

9.16 Data retrieved from the computer which supplied information to the console for Fritz, the ARTS IIIA system, showed that the computer received the discrete transponder code 4564 twice.

9.17 Deposition Exhibit 230 accurately reflects beacon code returns of 4564 from the MU–2 aircraft as follows:

Time: 1956:50.949 Altitude: 1900 ft
Time: 1956:55.652 Altitude: 2100 ft

These times are CDR Times and are not corrected to correspond with the voice time

---

2. "Squawk" refers to the discrete beacon code that identifies the aircraft on the ATC's radar

scope.

as reflected in the radio transcript. Altitude is above mean sea level. Accuracy of altitude is plus or minus 50 feet and is dependent upon prior setting of barometric pressure.[3]

9.18 The "unintelligible sound" at 1957:01 (transcript time) came from the MU-2 and contains sound which was reflective of the keying of the MU-2 microphone on and off.

9.19 The two aircraft collided approximately two miles northeast of the Greenwood Airport when the front section of the Saratoga struck the tail section of the MU-2.

9.20 The radios and other cockpit equipment of both aircraft were destroyed to such a condition that investigators could not determine radio frequency setting or ascertain other information from cockpit instruments.

9.21 Neither aircraft had a flight data recorder or a cockpit voice recorder.

9.22 Associated Aviation Underwriters had in full force and effect a policy of insurance which provided partial coverage for the MU-2 aircraft which is the subject of this litigation and Associated Aviation Underwriters, via its member companies, paid to or on behalf of Solar Sources, Inc. pursuant to its contract of insurance:

- Loss paid for total destruction of aircraft — $720,000.00
- Heritage Remediation Engineering, Inc. — $ 36,474.00
- ChemLawn — $ 13,248.00

**TOTAL DAMAGES:** $769,722.00

## II. FINDINGS OF FACT ON MATTERS NOT SUBJECT TO STIPULATIONS[4]

### A. TIMING ISSUES

■ There is a time discrepancy between the two methods of recording radar data. Resolution of this discrepancy and synchronization of these times is necessary to appropriately determine the time of collision. The correct time is that recorded by the National Track Analysis Program[5] ("NTAP") radar.[6] The NTAP radar times are fed directly into the NTAP computer by the time source. The time source is a radio monitor of WWV, the National Bureau of Standards radio station which broadcasts the time continuously from the official atomic clock in Fort Collins, Colorado. That time system is not subject to inaccuracy, other than the ten microsecond tolerance allowed the WWV broadcast itself. CDR time, the time recorded at Indianapolis TRACON, is kept accurate by the supervisor using the direct time access clock and updating the time in the terminal computer. The supervisor only updates the terminal computer time if it is off WWV time by more that 15 seconds. (Archung Dep.Vol. I at 79.) Thus, NTAP data, rather than CDR data, reflects real time.

The voice transcript time is also tied to WWV time and is considered highly accurate. The voice transcript showed that the times recorded on the CDR radar transcript could not be real time because there were logical inconsistencies between the two sets of data. For example, discrete beacon code "4564" appears on the computer radar data prior to the time the voice transcript shows Fritz providing that number to Mullen.

■ Several experts in this case sought to quantify the error of the CDR clock. The most credible effort was done by Mr. O'Rourke, Solar Sources's ATC expert. He found that the CDR time was 10 seconds behind NTAP time. Prior to trial, Mr. O'Rourke opined that the CDR time was off by 8–10 seconds. However, at trial he narrowed this opinion to 10 seconds and demonstrated the manner in which he obtained that figure. Mr. O'Rourke utilized two methods

---

3. The barometric pressure is set to a standard setting within the transponder itself. The computer at the radar is adjusted so that the displayed altitude is accurate. The barometric pressure set inside the aircraft is wholly separate from the transponder altitude and is set manually by the pilot.

4. Some findings may include legal conclusions based upon facts or at least mixed questions of law and fact, for example, a determination of negligence.

5. NTAP data generally records radar from planes en route—at a higher altitude and for longer distances.

6. Although at the summary judgment stage, the parties' experts disagreed as to which radar time recording was off, all experts now agree that the NTAP data times are accurate.

to verify this time discrepancy. First, he graphed the differences between the two recorded times and compared them for both aircraft, taking into account a 100 foot constant inconsistency in altitude. He found that with the 100 foot altitude adjustment and the 10 second time adjustment, the data was consistent as to altitude and within 7/10ths of a second. He then compared the adjusted CDR time to the voice transcript and found no logical inconsistencies. The court finds Mr. O'Rourke's estimate of 10 seconds more credible than the United States' experts' estimates of 3–4 seconds.[7] Thus, to convert CDR time to real time, 10 seconds must be added to each recorded time.[8]

## B. THE COLLISION

When the two aircraft collided, the propeller spinner of the Piper Saratoga aircraft impacted near the base of the vertical stabilizer on the rear portion of the MU–2. This impact sheared away the rear empennage structure. This empennage structure consisted of the rear horizontal wings, both right and left, and the vertical stabilizer which contained the rudder. Upon separation of the empennage structure the MU–2 became uncontrollable and fell to the ground.

■ The court finds that the collision occurred between 1957:07–1957:12 and after the second and final transmission of the MU–2 discrete beacon code. At 1956:57, Fritz completed his instruction to Mullen to tune his transponder to "4564." The data demonstrates that the MU–2 transmitted the "4564" code twice before the actual collision. The court finds that these two transmissions both occurred before the collision for several reasons. First, the testimony of the air control experts reveals that if two aircraft are

close together, the transponder code will become garbled and that did not happen here. Furthermore, the number one transponder antenna and the number two communications antenna were affixed to the portion of the empennage that was disconnected. Therefore, no transponder signals could have been issued from the number one transponder after impact.[9] Finally, it is evident from the computer print-out of the radar data that the MU–2 activated its "ident" feature. The pilot manually activates this feature. It is unreasonable to assume that Mullen would have activated the ident feature **after** the collision. Thus, this also supports the court's finding that the collision occurred after the second "4564" beacon code. Although the court finds that the unintelligible sound at 1957:01 was the sound of the keying on and off of the MU–2 mike, the court does not associate any part of that sound with the collision.

There are two possible ways to determine the time of collision based upon the beacon codes. The first method is to adjust the CDR recorded time for the second hit.[10] A second, less precise method, is to work from the voice transcript and add the time necessary for the two "4564" beacon hits. Pursuant to the first method, the court calculates the time of collision by adding the 10 second time differential to the CDR recorded time. The second beacon code occurred at 1956:56 CDR time. In order to adjust CDR time to real time, 10 seconds must be added to this figure making the hit at 1957:06. There was also testimony that the collision must have occurred at least one full second after this last radar transmission and it could have occurred as late as 4.7 seconds later (the time necessary for the radar to make a full sweep). Thus, the time of impact is thus

---

7. For example, Mr. Beaudoin, one of the United States' experts, reached his 3–4 second conclusion from examining the ascent of the MU–2. He did not look for any consistent altitude discrepancies, nor did he evaluate the difference for the Piper descent. This research was not as thorough as that done by Mr. O'Rourke and the results are not as well founded.

8. All times set forth in this entry are real time unless they are specifically referred to as CDR time.

9. The United States argues that the transmission could have been sent through the antenna under the left wing after the collision. There was no evidence in the record showing that this was the case. However, even if this were possible, the preponderance of the evidence shows that the collision occurred after the second "4564" beacon code.

10. A hit refers to the information about the aircraft obtained from the radar that is reflected on the scope.

somewhere between 1957:07 and 1957:11 (both times rounded to the nearest second).

This time of collision is also consistent with the information available through the second method of verifying collision time. The second method is less precise, but it allows the court to determine that the time of collision is in the appropriate range. Mullen was told to enter the beacon code at 1956:57 and the evidence showed that it would take at least three seconds to dial in the code and may have taken as much as ten seconds. Assuming conservatively that this instruction was completed just as the transponder antenna at Indianapolis swept by the MU–2 and assuming that Mullen could dial in the code "4564" before the antenna completed its next revolution (4.7 seconds), then the first "4564" beacon code return would have occurred 4.7 seconds later. The next hit must have occurred 4.7 seconds later. Thus placing the second sweep at 1957:06.4. Adding the above determined range for the collision after that hit places the time of collision somewhere between 1957:07 and 1957:12 (both times rounded to the nearest second). This is within the range that the court determined for the time of collision.

### C. ANDREWS'S STUDIES

■ Solar Sources presented the testimony of Kenneth Orloff, who relied in substantial part on studies performed for the Federal Aviation Administration, by Lincoln Laboratories at the Massachusetts Institute of Technology. The studies were performed under the supervision of Dr. John Andrews, who ultimately authored a series of papers describing the studies and a mathematical model which was formulated for determining the probability of a pilot detecting a target aircraft in sufficient time to avoid it.

These studies were based on experiments conducted using actual pilots with various degrees of experience, operating various aircraft in a variety of meteorological conditions over terrain of varying backgrounds. The mathematical models developed by Dr. Andrews have been published, have been subject to peer review, and have gained general acceptance in the relevant scientific community. Dr. Andrews's models have been accepted and used by the Federal Aviation Authority and the National Transportation Safety Board in connection with analyzing the causes of mid-air collisions.

Dr. Orloff used these models in calculating the probability of the pilots in this case visually acquiring the other aircraft given certain assumptions. Dr. Orloff testified that under the conditions present immediately before the collision, the cumulative probability of the pilot of the MU–2 seeing the Saratoga without having been alerted to the Saratoga's presence would have been less than 50% at 12 seconds prior to impact. Similarly, he testified that the pilot of the Saratoga, not having been alerted to the MU–2's presence, would have also had less than 50% chance of seeing the MU–2 at 12 seconds before impact. In contrast, Orloff testified, that had the pilots been alerted by controller Fritz 15 seconds before impact the probability of one of them seeing the other aircraft in time to avoid the collision would have exceeded 90%.

Dr. Orloff's opinions are based, at least in part, on the use of the mathematical models developed by Dr. Andrews [11]. However, Dr. Orloff had to make assumptions as to many variables to insert into the equation. For example, Dr. Orloff stated that the height of the pilot was irrelevant, the exact background was irrelevant, and that the possible existence of clouds was not relevant. The number of variables used and the necessary assumptions therefrom lead the court to question Dr. Orloff's findings. Moreover, although Dr. Andrews's equation was tested with real pilots, those tests involved rectilinear unaccelerated flight. Dr. Orloff on the other hand, applied the Andrews equation to varying speed nonrectilinear flight. Dr. Orloff's method has not been tested. Furthermore, he stated that his findings are based upon the assumption that the test pilots were

---

11. Dr. Andrews created an equation that through the use of variables is adaptable to visual acquisition in any flight pattern. His model was only tested for aircraft on a restricted rectilinear unaccelerated flight path. He also created his own computer program that will determine the percentage chance of visual acquisition of planes on a restricted rectilinear unaccelerated flight path.

vigilant in their efforts to see and avoid other aircraft. However, it is unclear how that assumption is incorporated in the Andrews studies.

Furthermore, Dr. Orloff frequently used language which suggested that his opinions were based on principles of vision, an area in which he has no background or expertise. Additionally, certain demonstrative exhibits submitted in connection with his testimony (that is, the video depictions) were based on questionable premises and were potentially quite misleading as noted below. As a result, a trier of fact would have to be very reticent to resting a conclusion on such questionable guidance.

■ There is also a fundamental problem with Dr. Orloff's testimony from a policy standpoint. To allocate liability solely based upon Dr. Orloff's findings would virtually eviscerate the "see and avoid" [12] concept. According to Dr. Orloff's testimony in this case, an unalerted pilot has a 44% chance of locating a target; accordingly, such a pilot could never be responsible for a midair collision. Thus, although there is some value to Dr. Orloff's use of the Andrews studies, the court will not adopt his findings outright. To the limited extent that his findings illustrate the proposition that an alerted pilot is much more likely to see a target, the court finds his testimony helpful.

Dr. Orloff further testified that one of the most significant aspects of the studies conducted under the supervision of Dr. Andrews is that they demonstrate the extreme difficulty of a pilot seeing another aircraft on a collision course where that pilot has no prior knowledge of the presence of that other aircraft. Conversely, the studies demonstrate that where the pilot is alerted to the presence of another aircraft on a collision course, the pilot's ability to see, or visually acquire, that other aircraft is greatly increased.

## D. VIDEO SIMULATION OF VIEWS PROCEEDING COLLISION

■ Solar Sources also presented a computer simulation of the view from the cockpits of both the MU–2 and the Saratoga in the seconds before the collision. This reconstruction purports to demonstrate the relative size, speed, and location of the oncoming plane and obstructions to the pilots' view. The reconstruction shows the MU–2 pilot's view obstructed by the window post. This re-creation was also based upon the assumptions Dr. Orloff made in applying the Andrews model. Thus, these assumptions detract from the persuasiveness of the video. Moreover, the court finds that the pilot's duty to be vigilant in an effort to see and avoid other aircraft includes the duty of the pilot to move his head and body to attempt to eliminate blind spots. Thus, because the reconstruction was necessarily made from an immobile point of view, the court finds that it does not sufficiently demonstrate what was available for Mullen's view through a diligent search of the sky.

## E. CONDUCT OF MULLEN

■ The court finds that the decision of Mullen to depart the airport VFR and then establish contact with the air control facility to pick up IFR [13] clearance while still climb-

---

**12.** The "see and avoid" concept requires that vigilance be maintained at all times, by each person operating an aircraft, regardless of whether the operation is conducted under IFR or VFR. Advisory Circular (AC) 90–48C, 03/18/83; 14 C.F.R. part 91.

**13.** VFR, or Visual Flight Rules, represent one of the two different sets of flight rules under which a flight may be conducted. VFR govern the procedures for conducting flight under visual conditions, and may indicate weather conditions that are equal to or greater than minimum VFR requirements, or may indicate a type of flight plan. A VFR flight can be termed "fair weather flying" because the weather conditions must allow the pilot to "see and avoid" other aircraft

and maintain visual contact with the ground. A pilot directs his aircraft according to what he can see, navigating from place to place according to visual cues outside his aircraft. Visual flight rules are found at 14 C.F.R. §§ 91.151 through 91.159.

IFR, or Instrument Flight Rules, represent the second set of flight rules and govern the procedures for conducting instrument flight and may indicate a type of flight plan. It is presumed that pilots cannot see other aircraft or the ground and need the assistance of air traffic controllers. A pilot must file an IFR flight plan indicating his destination, proposed route of flight and requested altitude, and maintain radio communication with the Air Traffic Control system. 14 C.F.R.

ing away from the airport, rather than calling ahead and obtaining a void time while on the ground or waiting until a less critical time to obtain his IFR clearance, is a practice which is routinely followed by pilots leaving uncontrolled airports in visual meteorological conditions. However, such a decision, while it may be reasonable in the abstract, increases a pilot's duty to be vigilant to see and avoid other aircraft. This is especially true when departing approximately one hour after the time indicated in the flight plan. A pilot must be aware that certain decisions affect his ability to see and avoid other aircraft. Inevitably, obtaining clearance will draw a pilot's attention to the interior of the cockpit for the selection of the transponder code setting and related clearance instructions. This activity, combined with other choices made by Mullen, shows that his overall conduct was not without fault.

 After takeoff, Mullen made a right-hand turn. Under the provisions of the Airmen's Information Manual, left-hand turns are recommended after takeoff. Advisory Circular 90–66 (1975). Because they are only recommendations, non-compliance with the provisions does not constitute negligence per se. Non-compliance can, however, under certain circumstances, constitute a failure to exercise reasonable care. Such is the case here. Mullen's activity may have been motivated by the unique nature of the traffic at Greenwood, the airport's proximity to the Indianapolis ARSA, and the power of the MU–2; however, this non-standard practice, which places him in an area that is not specifically expected by incoming traffic, further raises his duty to be vigilant.

Also, Mullen failed to give direction and altitude while calling—which, though not required, would have been more likely to signal an issue for attention to Fritz.

Again, in and of itself, the fact that Mullen did not see the Saratoga in order to avoid the collision does not lead to the conclusion that he failed to exercise reasonable care in the operation of his aircraft. It is certainly true that he would have been more likely to see

the Saratoga had Fritz issued a traffic advisory or a safety alert. However, Fritz's duties do not negate Mullen's duties. VFR aircraft are required to maintain their own separation from aircraft without relying exclusively on the services of the air traffic controllers. Thus, the facts that Mullen initiated a non-standard right-hand turn, and decided to obtain his IFR clearance at a critical time in take off increased his duty to be vigilant. The fact that he failed to see the Saratoga is evidence that he did not maintain this heightened level of vigilance. Mullen's activities, at least in part, were negligent and were one of the proximate causes of the midair collision.

## F. CONDUCT OF BENNETT

The landing pattern at the Greenwood Airport is left hand, which means that all traffic approaching to land is required to do so by executing left-hand turns. 14 C.F.R. § 91.127(b)(1) (1992). In order to enter the landing pattern from the north for the purpose of executing a northbound landing, a pilot should enter a southbound, downwind leg on the west side of the airport. For the Saratoga to have landed at the Greenwood Airport as Bennett intended to do, Bennett, upon severing radio contact with Fritz, should have headed to the west of the airport, not to the east. At the time of the collision, Bennett was northeast of the Greenwood Airport, the least likely place for a pilot taking off from Runway 36 to expect incoming traffic.

While Bennett was flying the Saratoga south from Terry Airport toward Greenwood, his passenger, Mark Doucey, used a video camera to shoot footage of the Indianapolis skyline, a Citizens Gas plant, the Beech Grove rail yard, and ultimately the new corporate headquarters for Control Systems Engineering, which was located to the north and east of the Greenwood Airport.

There is circumstantial evidence that Bennett was distracted by Doucey's videotaping activities which prevented him from exercis-

---

§§ 19.173, 91.183. Control of the aircraft is maintained by various instruments on board, and navigation is accomplished through various navigational aids which receive and broadcast data from ground stations. IFR are found at 14 C.F.R. §§ 9.167 through 9.187.

ing the required vigilance to see and avoid the MU–2. Doucey testified that he was using a video camera to take aerial videotape of the Control Systems headquarters. The collision occurred just past the closest point of the Saratoga's approach to the building. Doucey testified that he stopped filming some 30 seconds prior to the collision. However, 30 seconds prior to the collision, the Saratoga was approximately a full mile north of the Control Systems building. The course he was on immediately prior to the collision, i.e. just abreast of the Control Systems building, coincides more closely with filming up to shortly before the collision. Additionally, Julie Bennett stated in her deposition that they had just finished filming when the collision occurred. Thus, it is unreasonable to believe that Doucey would have stopped filming that far from the building. The court infers, therefore, that Doucey either had not stopped filming at the time of the collision or had concluded filming just seconds before the collision. Moreover, the court infers that Bennett, who as the owner of Control Systems had a great interest in the building, was distracted from his duties as a pilot by the videotaping activities. This would account for Bennett's failure to see the MU–2 in time to avoid a collision, even though the MU–2 had just taken off from an airport at which Bennett intended to land.

Bennett never informed air controller Fritz of the videotaping activities. Nor did he request Fritz to follow his flight in light of these activities which would have enhanced Fritz's abilities to maintain safe aircraft separation.

 At the time of the collision, Federal Aviation Regulations provided that:

91.67 Right of Way Rules.

(a) General. When the weather conditions permit, regardless of whether an operation is conducted under instrument flight rules or visual flight rules, vigilance shall be maintained by each person operating an aircraft so as to see and avoid other aircraft in compliance with this section. When a rule of this section gives another aircraft the right-of-way, he shall give way to that air-

craft and may not pass over, under, or ahead of it, unless well clear.

(c) Converging. When aircraft of the same category are converging at approximately the same altitude (except head-on, or nearly so) the aircraft to the other's right has the right-of-way.

14 C.F.R. § 91.67 (1992). Immediately before the collision, the MU–2 was on a course which carried it toward the Saratoga from the right. As such, pursuant to the regulation, Bennett was required to yield the right-of-way to the MU–2. The preponderance of the evidence shows, however, that moments before the collision, Bennett made a climbing turn to the left which caused the Saratoga to turn into and strike the MU–2. The evidence shows that had Bennett flown the Saratoga straight ahead or turned to the right, while either ascending or descending, the collision most probably would not have occurred. Therefore, the court concludes that Bennett failed to yield the right-of-way in accordance with Federal Aviation Regulations.

The court finds that Bennett was negligent in flying his aircraft to the northeast of the Greenwood Airport prior to landing in contradiction to the usual landing pattern incorporating left-hand turns; in allowing himself to be distracted by Doucey's videotaping activities such that he was not vigilant to see and avoid the MU–2; and by failing to yield the right-of-way to the MU–2 in accordance with Federal Aviation Regulation 91.67. Bennett was also a proximate cause of this midair collision.

## G. ACTIVITIES OF FRITZ

Air traffic controller Fritz assumed responsibility for INDTRACON–E and was at his radar/computer console approximately ten minutes before the collision in question occurred. He controlled the progress of the Saratoga as it travelled south until he terminated radar service and instructed Bennett to change his transponder code from "0301" to "1200". Controller Fritz admitted that, after that transmission, he no longer monitored the flight path of the Saratoga aircraft. At approximately the same time, Fritz was

also working [14] another IFR aircraft and attempting to locate a missing flight strip for some military aircraft that were soon to be entering Fritz's area.

Approximately 45 seconds prior to first contact by radio from Mullen, the pilot of the MU-2, and approximately 75 seconds prior to the collision, Fritz had his last communication with the Saratoga. At that time, Fritz clearly knew the location, speed, and altitude of the Saratoga and its position relative to its declared destination of the Greenwood Airport. Fritz's instruments continued to track the Saratoga south toward its stated destination at a constant speed. By the time of the collision, the Saratoga had only varied in altitude by descending approximately 400 feet. It should have been evident to Fritz, without even observing his scope, that the Saratoga would be descending to achieve its stated goal of landing at Greenwood.

When Mullen contacted Indianapolis Departure Control, Fritz responded immediately and gave Mullen a discrete transponder code. The transponder code was available from Mullen's filed flight plan which was reduced to a flight strip which was in its proper location by Fritz's right hand. The immediate response by Fritz shows that he was aware of the MU-2's impending flight, either because he had reviewed the flight strips when he started work or because the strip was immediately handy to him. Although Mullen departed approximately an hour later than the estimated time on his flight strip, this was not an uncommon practice for pilots. Thus it was reasonable for Fritz to still expect the MU-2 to depart from Greenwood Airport for its planned IFR flight to Columbus.

Fritz testified that he knew the wind direction at the Indianapolis airport and that he generally knew that the Greenwood runway was a north-south runway. However, he stated that he did not know the direction of the winds at Greenwood (even though it is less then fifteen miles from the Indianapolis airport) or pilots' preferences for landing into the wind. The court notes that there was testimony from at least one ATC expert that a good ATC would know this information. However, at the very least, Mullen's "off Greenwood" transmission should have directed Fritz's attention to Greenwood Airport on his scope.

Fritz's radar scope projected radar returns as well as computer-generated target symbols and flight data including transponder coding, altitude, and speed. It showed the location of satellite airports in the Indianapolis area, including Greenwood. At a minimum, Fritz had a radar image and a computer-generated VFR target on his scope showing the MU-2 climbing and moving away from the north end of the Greenwood Airport with the MU-2's altitude displayed. At the same time, the Saratoga continued to be present on Fritz's scope tracking south toward the Greenwood area.

Fritz's instruments clearly showed that the Saratoga and MU-2 were on converging flight paths. Fritz had no obstructions to his view of these two aircraft on his scope. The information directly in front of Fritz clearly showed that there were two aircraft flying into the same airspace.

Measuring the elapsed time from the point at which Mullen announced "off Greenwood" (1956:48.0) (the latest event which should have caused air controller Fritz to look at his scope in the Greenwood area) until the probable time of impact (1957:07–1957:11) results in a minimum time of 19 seconds and perhaps as much as 23 seconds available to Fritz to issue a traffic alert or other warning.

The Court further infers that because Fritz had recently received transmissions from the Saratoga, and because Fritz expected or should have expected the departure of the MU-2 from Greenwood, Fritz should have scanned the Greenwood area on his radar scope at the time of the MU-2's first call up which was completed at 1956:44. Using this as a starting point, Fritz had between 21 seconds and 25 seconds in which to observe the situation and issue an alert.

**14.** "Working" means that Fritz was in radio contact with the plane. "Controlling" refers to contact when the aircraft is radar identified.

At 10 seconds prior to the collision the aircraft were still more than ½ mile apart. Testimony showed that a warning even 3–4 seconds before the collision would have been helpful in the avoidance of the collision (which even Government pilot expert Coogan concedes). In fact, the 21–25 seconds even exceeds the time submitted in documents drafted by the FAA which provide that 12.5 seconds is sufficient time for an average unalerted pilot to see and avoid a potential plane. An alert would decrease this response time substantially. In the exercise of required vigilance, air controller Fritz had more than sufficient time to see and or hear indicia of the converging aircraft and issue an alert. His failure to do so was a proximate cause of the accident. Had Mullen been warned of the proximity of another aircraft, his chances of seeing and avoiding the other aircraft would have been greatly enhanced.

A videotape of a re-creation of the data available at Fritz's radar scope for the relevant time period shows that, for the 15 to 20 seconds following Mullen's radio transmission that the MU–2 was "off Greenwood", the MU–2 and the Saratoga continued on a converging collision course. During that period, Fritz never alerted either pilot of the presence of the other aircraft. It is reasonable for this court to infer that the reason Fritz failed to notice that the aircraft were on a collision course was that his full attention was not focused on the radar scope during the relevant period, nor was he correlating the recently heard destination of the Saratoga with the more recent audio information from the MU–2.

The court finds by a preponderance of the evidence that, if Fritz had exercised reasonable care to observe and recognize that the aircraft were on a collision course, he could have issued a safety alert to the pilots in time for them to see the other aircraft and to take action necessary to avoid the collision.

Fritz's failure to become aware of the unsafe proximity of the aircraft under these circumstances was negligent. Specifically, he knew the Saratoga intended to land at Greenwood and less than 45 seconds later he was in radio contact with an aircraft stating that it was taking off from Greenwood. Both aircraft appeared on Fritz's scope which showed the aircraft were on a potential collision course. The court finds that Fritz's inattention to his radar scope was such that he was unaware of the unsafe proximity of the Saratoga and MU–2 and his resulting failure to issue a warning or safety alert to Mullen was a breach of his primary duty to prevent a collision between aircraft. The United States, through its agent, Fritz, was negligent in failing to remain vigilant, to observe and recognize that the two aircraft were in unsafe proximity to one another and on a collision course and to issue a safety alert or warning to Mullen in time for them to see and take action to avoid the collision.

## III. CONCLUSIONS OF LAW

The consolidated actions were brought against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–80. The court has jurisdiction over the claims against the United States pursuant to 28 U.S.C. § 1346(b) *et seq.* It has jurisdiction over the claims against the private defendants pursuant to 28 U.S.C. § 1367.

■ The substantive law of the State of Indiana controls these proceedings. *Richards v. United States*, 369 U.S. 1, 10, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962). Thus, the negligence claims are covered by the Indiana Comparative Fault statute. Pursuant to the terms of the Indiana Comparative Fault Act, IND.CODE § 34–4–33–1 *et seq.*, in an action based on negligence, the finder of fact is to apportion fault among all parties whose conduct proximately caused the injury or damage for which recovery is sought. Specifically, in an action for negligence under Indiana law, a plaintiff must show that the defendant owed the plaintiff a duty arising from their relationship, that the duty was breached, and that the breach was the proximate cause of the plaintiff's injury. *Claxton v. Hutton*, 615 N.E.2d 471, 474 (Ind.Ct.App.1993).

■ The United States is a party to this action based upon the acts of its employee, Fritz. The United States is liable, in the same manner and to the same extent as private individuals under like circumstances, for the negligent acts or omissions of govern-

ment employees. 28 U.S.C. § 2674. The operation of air traffic control facilities is a legislative decision and the negligent operation of a facility subjects the United States to liability. *Yates v. United States,* 497 F.2d 878, 884 (10th Cir.1974).

The relative legal duties of each of the actors is set forth below.

### 1. The Pilots

Pilots have a duty to provide their own separation from aircraft. Specifically, the regulations state:

> When weather conditions permit, regardless of whether an operation is conducted under instrument flight rules or visual flight rules, vigilance shall be maintained by each person operating an aircraft so as to see and avoid other aircraft.

14 C.F.R. § 91.113(b). The United States argues in this case, as it has in many others, that this standard imposes something akin to strict liability upon the pilots. However, this court rejects that view and finds that a pilot is required to act with reasonable care in maintaining vigilance. *Transco Leasing Corp. v. United States,* 896 F.2d 1435 (5th Cir.1990); *Steering Committee v. United States,* 6 F.3d 572, 579 (9th Cir.1993). The standard of reasonable care is that of a similarly skilled pilot in the same circumstance.

Although the standard of vigilance has been defined as concurrent with reasonable care, there are certain times when a pilot must increase his vigilance. *Transco,* 896 F.2d at 1447. For example, in *Transco,* the court incorporated an expert's testimony that "a pilot should increase his vigilance in high traffic areas, such as the airport traffic area...." *Id.* Moreover, this standard does not allow for a pilot to be immobile to effectively maintain vigilance. A pilot has a responsibility to move his head and possibly the aircraft so as best to avoid blind spots. *Rudelson v. United States,* 602 F.2d 1326, 1330 (9th Cir.1979). Thus, with this understanding of vigilance in mind, the court concludes that both pilots were negligent in certain degrees.

### a. Bennett

Bennett, the pilot of the Saratoga, acted negligently and proximately caused this midair collision. First, Bennett was not in the expected location for landing at Greenwood Airport. At the time of the collision, there was a left-hand turn landing pattern in effect for the Greenwood Airport. 14 C.F.R. § 91.127(b)(1) (1992). Bennett violated this regulation by his location immediately prior to the collision. A violation of Federal Aviation Regulations is some evidence of negligence. *In re Air Crash Disaster at JFK International Airport,* 635 F.2d 67, 76 (2d Cir.1980). His unexpected location put a burden on Bennett to increase his vigilance in an attempt to see and avoid other aircraft.

While Bennett was northeast of Greenwood Airport, an unusual location for an aircraft decreasing altitude for landing at Greenwood, he was also involved in filming the Control Systems Engineering office building. This activity constituted a distraction when Bennett should have been exercising heightened vigilance.

Bennett was also negligent in his failure to observe right-of-way rules. At the time of the collision, there was in full force and effect, the following Federal Aviation Regulation:

> 91.67 Right of Way Rules.
> (a) General. When the weather conditions permit, regardless of whether an operation is conducted under instrument flight rules or visual flight rules, vigilance shall be maintained by each person operating an aircraft so as to see and avoid other aircraft in compliance with this section. When a rule of this section gives another aircraft the right-of-way, he shall give way to that aircraft and may not pass over, under, or ahead of it, unless well clear.
> (c) Converging. When aircraft of the same category are converging at approximately the same altitude (except head-on, or nearly so) the aircraft to the other's right has the right-of-way.

14 C.F.R. § 91.67 (1992). Bennett violated the right-of-way rules by flying in close proximity to the MU–2 and then by executing an

upward left-hand turn at the final seconds prior to the collision.

Bennett was negligent in failing to comply with the left-hand landing pattern for traffic at the Greenwood Airport; in violating Federal Aviation Regulation 91.67, requiring him to yield the right-of-way to the MU–2 which was approaching the Saratoga from the right; and in violating FAR 91.113 in failing to exercise vigilance to see and avoid the MU–2. Bennett's negligence constitutes 70% of the total fault contributing to the collision in question.

### b. Mullen

 Mullen, the pilot of the MU–2, was also negligent in his failure to maintain vigilance and see and avoid the Saratoga. Mullen was in an area which called for heightened vigilance. He was taking-off from an uncontrolled airport that traditionally had a lot of pilot training activity surrounding it. He was in a fast, high-powered aircraft that had the ability to quickly overtake other traffic. He was executing a non-standard right-hand turn while climbing away from the airport, placing him in a location where he might not be expected, that is, in a high risk position. All of these factors lead to the need for higher vigilance. However, Mullen initiated contact with Indianapolis TRACON during this high activity time. He did not provide the ATC Fritz with his altitude, direction or destination. The decision to initiate contact to obtain his IFR clearance detracted from his vigilance. Ultimately, Mullen breached his duty of vigilance in failing to see and avoid the oncoming Saratoga. Thus, Mullen's negligence was also a proximate cause of this collision. Mullen's negligence constitutes 5% of the total fault contribution to the collision in question.

### 2. Air Traffic Controller Fritz

[20] Negligence on the part of pilots does not relieve an air traffic controller of his responsibility. *Webb v. United States,* 840 F.Supp. 1484, 1511 (D.Utah 1994). "Because both are responsible for the safety of the aircraft, negligence on the part of the pilot does not automatically relieve FAA personnel of their duties of care." *Id.* Thus, Fritz may also be a cause of this midair collision.

 An air traffic controller's duties to pilots are defined by both the Air Traffic Control Manual and common law. The Manual sets forth a general responsibility to maintain separation of aircraft. Paragraphs 2–2(a) and (b) state that the primary duty of all ATCs is to maintain separation of aircraft. This duty exists no matter what the ATC is doing in the course of his or her work. Although this duty is not exact or well-defined, it does provide a framework upon which to place other more specific duties of the ATC. The Manual provides for two specific types of warnings that are at issue in this case. First, ATCs are required to issue safety alerts as a first priority.[15]

**2–6 SAFETY ALERT**

Issue a safety alert to an aircraft if you are aware the aircraft is at an altitude which, in your judgment, places it in unsafe proximity to ... other aircraft. Once the pilot informs you action is being taken to resolve the situation, you may discontinue the issuance of further alerts. Do not assume that because someone else has responsibility for the aircraft that the unsafe situation has been observed and the safety alert issued; inform the appropriate controller.

2–6 Note 1.—The issuance of a safety alert is a first priority (see paragraph 2–2) once the controller observes and recognizes a situation of unsafe aircraft proximity to ... other aircraft. Conditions, such as workload, traffic volume, the quality/limitations of the radar system, and the available lead time to react are factors in determining whether it is reasonable for the controller to observe and recognize such situations. While a controller cannot see immediately the development of every situation where a safety alert must be issued, the controller must remain vigilant

---

**15.** The MU–2 was in the process of being radar identified by Fritz immediately prior to the collision.

for such situations and issue a safety alert when the situation is recognized.

Manual ¶ 5–78(b). This section establishes a duty to issue a safety alert to aircraft under the ATC's control. The Manual provides that air traffic controllers have a duty to remain vigilant for the development of a situation where a safety alert must be issued. Manual ¶ 2–6, n. 1. The Manual provides that air traffic controllers have a duty to issue a safety alert as a first priority once the controller sees and recognizes an aircraft at an unsafe proximity to terrain, obstructions, or other aircraft. Manual ¶ 2–6.

■■■ An ATC also has a duty to issue traffic advisories. Traffic advisories are defined in the Manual as:

Advisories issued to alert pilots to other known or observed air traffic which may be in such proximity to the position or intended route of flight of their aircraft to warrant their attention. Such advisories may be based on:

1. Visual observation.

2. Observation of radar identified and nonidentified aircraft targets on an ATC radar display, or

3. Verbal reports from pilots or other facilities. . . .—Traffic advisory service will be provided to the extent possible depending on higher priority duties of the controller of other limitations, e.g., radar limitations, volume of traffic, frequency congestion, or controller workload. Radar/nonradar traffic advisories do not relieve the pilot of his responsibility to see and avoid other aircraft. Pilots are cautioned that there are many times when the controller is not able to give traffic advisories concerning all traffic in the aircraft's proximity; in other words, when a pilot requests or is receiving traffic advisories, he should not assume that all traffic will be issued.

(Definition of "Traffic Advisories," Pilot/Controller Glossary (June 25, 1992).) The Manual further states that an ATC shall:

2–21 TRAFFIC ADVISORIES

[i]ssue traffic advisories to all aircraft (IFR or VFR) . . . where no separation minima applies, such as for VFR aircraft

outside an ARSA . . . issue traffic advisories to those aircraft on your frequency when in your judgment the proximity warrants it. Provide this service as follows:

(a) to radar identified aircraft;

(b) to aircraft that are not radar identified

Manual ¶ 2–21. The Manual encompasses the situation which faced this ATC. Fritz had aircraft flying VFR (he was going through the process of radar identifying the MU–2), both planes were outside the ARSA, the MU–2 was on the ATC's frequency and the aircraft were in close proximity to each other. Fritz had just discontinued radio contact with the Saratoga, he knew where the Saratoga was headed, the MU–2 had filed a flight strip with its intention to take off from Greenwood, and both planes were on his scope which showed them in close proximity to one another. In such situations there is a duty to issue a traffic advisory because an ATC is required to give all warnings specified in the Manual. *Davis v. United States,* 824 F.2d 549, 550 (7th Cir.1987).

In a case similar to the one at bar, a district court found an ATC had a legal duty to issue a traffic advisory as stated in the Manual. In *Frutin v. Dryvit Systems,* 760 F.Supp. 234 (D.Mass.1991), the court found a duty to warn where the ATC was in contact with one pilot and was arguably able to see the other plane on his radar. "Once the Navajo had made radio contact with ATC, the government's discretionary function under VFR ceased, the government's role rose to operational level." *Id.* at 237. The court found liability based upon the fact that even though the plane was flying VFR at the time, the pilot was in radio contact. "When a plane is in contact with ATC, the FAA tells the pilot that the controller's primary duty is to separate the plane from other aircraft." *Id.* at 236. The case at bar is similar to *Frutin* in that the ATC was in radio contact with the MU–2 and not only was the Saratoga arguably still visible on the radar scope, ATC Fritz had just terminated radio contact with the Saratoga and knew the destination of the Saratoga. In such situations, the ATC has a duty to issue a traffic advisory if a

reasonable air traffic controller in the same situation would do so.

■ An ATC's legal duty to issue a warning may also be found in common law. In certain instances, common law recognizes a duty that is more broad than the duty set forth in the Manual. Courts have recognized this duty based on the tort principle that "once the Government has assumed a function or service, it is liable for negligent performance." *Davis,* 824 F.2d at 550–51 (quoting *Spaulding v. United States,* 455 F.2d 222, 226–7 (9th Cir.1972)). The Government cannot limit this liability solely by relying on the Manual. As one court stated: "we disapprove the view that the duty of an FAA controller is circumscribed within the narrow limits of an operations manual and nothing more." *Hartz v. United States,* 387 F.2d 870, 874 (8th Cir.1968). The Seventh Circuit has defined this duty as follows:

> The air traffic controller is required to give all information and warnings specified in his manuals, and in certain situations he must give warnings beyond the manuals. (When danger is immediate, extreme, or known only to federal personnel; when the controller is better qualified to evaluate a given situation or make more accurate observations than the pilot).

*Davis,* 824 F.2d at 550 (quoting *Spaulding,* 455 F.2d at 226–27). This situation is one where the danger was immediate and extreme, and therefore a legal duty exists beyond that which is defined in the Manual.

As discussed in this court's earlier entry on the United States' motion for summary judgment, a review of law in this area reveals an array of findings as to whether an ATC's duty to maintain separation of aircraft is nullified when planes are flying VFR. Courts that find nullification base it upon the pilot's duty to maintain separation of aircraft. An example of a case finding nullification is *Redhead v. United States,* 686 F.2d 178, 183 (3d Cir.1982), *cert. denied,* 459 U.S. 1203, 103 S.Ct. 1190, 75 L.Ed.2d 435 (1984), which states that the ATC has no duty to warn of situations that the pilot should already be aware of based on his training, experience, and personal observations. *Id.; see also In re N–500L Cases,* 691 F.2d 15, 28 (1st Cir.

1982); *McDaniel v. United States,* 553 F.Supp. 910, 916 (N.D.Cal.1982) (finding no duty on part of ATC to issue traffic advisory to VFR pilot based upon elevation above dangerous terrain).

■ However, the more reasoned and prevailing view is that the ATC and the pilot have concurrent duties to maintain separation of aircraft. *Davis,* 824 F.2d at 551; *Arnold v. Eastern Air Lines, Inc.,* 681 F.2d 186, 194 n. 8 (4th Cir.1982), *cert. denied sub nom. Aetna Casualty & Sur. Co. v. United States,* 460 U.S. 1102, 103 S.Ct. 1801, 76 L.Ed.2d 366 (1983); *Mattschei v. United States,* 600 F.2d 205, 208 (9th Cir.1979); *Spaulding,* 455 F.2d at 226; *Hartz,* 387 F.2d at 873; *Webb v. United States,* 840 F.Supp. 1484, 1511 (D.Utah 1994); *Frutin,* 760 F.Supp. at 236–37; *Baker v. United States,* 417 F.Supp. 471, 485 (W.D.Wash.1975). In *Mattschei,* the court stated "while ultimate responsibility for the safe operation of aircraft rests with the pilots, regardless of air traffic clearance the duty to exercise due care to avoid accidents is a concurrent one resting on both control tower personnel and the pilot." *Mattschei,* 600 F.2d at 208 (citations omitted). Similarly, in *Webb,* the court stated:

> In airplane tort cases, the pilot and FAA personnel ... are burdened with concurrent duties of due care for the protection of the aircraft and its occupants. Because both are responsible for the safety of the aircraft, negligence on the part of the pilot does not automatically relieve FAA personnel of their duties of care.

*Webb,* 840 F.Supp. at 1511 (citations omitted). Thus, in this case the court finds that the ATC's duty to issue a warning was not nullified by the pilots' own duties to maintain separation from aircraft.

The scope of the legal duty setting forth when an ATC must issue a warning is not well defined in the ATC Manual, however, case law fleshes out the scope of this duty. The duty, though easily defined in general terms, is very fact specific and will probably require different action in every circumstance. The nature of the duty is defined by

what the ATC knew at the time of the alleged breach.

■ An ATC has a duty to issue all warnings that a reasonable ATC would issue under the same circumstances. *Biles v. United States,* 848 F.2d 661, 664 (5th Cir. 1988); *Spaulding,* 455 F.2d 222; *Hartz,* 387 F.2d at 873; *Webb,* 840 F.Supp. at 1515; *Frutin,* 760 F.Supp. at 236–37; *Baker,* 417 F.Supp. at 485. "Certainly the controller must assist even careless pilots who, based on the facts known to the controller, have placed themselves in a dangerous position ... [but only in situations where the controller could have known that the] aircraft was subject to dangerous conditions." *Biles,* 848 F.2d at 664 (finding no duty on the part of the ATC because she did not know about the dangerous weather conditions 15 miles away or that minimum VFR conditions were insufficient). Thus, in *Spaulding,* 455 F.2d 222, the court found that where the ATC knew or had reason to know about the likelihood of the crash, the ATC must issue a traffic advisory. *Id.; see also Frutin,* 760 F.Supp. at 236–37.

■ Factors that are relevant to the determination of what a reasonable ATC would do include the considerations set forth in the Manual. See Manual ¶¶ 2–6 & 2–21. These would include: higher priority duties of the ATC, radar limitations, volume of traffic, frequency congestion and controller workload. Although this is certainly not an exhaustive list of considerations, these factors are among those relevant to such a determination. In this case, these factors weigh in favor of issuing a traffic advisory. Fritz had a fairly light workload—he was only working [16] three planes in the minute prior to the collision and two of them collid-

ed. Although there was testimony that the impending arrival of some military aircraft into the ARSA was causing Fritz some concern because he was having problems locating the flight strip, this stress was not so great that Fritz should have been unaware of his other traffic. He was in radio contact with the MU–2 at the time when a traffic advisory would have been appropriate, thus there was no problem with him alerting one of the pilots. Moreover, although technically both of these aircraft were operating VFR when an advisory or warning would have been appropriate, the unique circumstances of this case merited a warning. As discussed above, Fritz had just released the Saratoga, knowing its location, altitude and destination. Within 45 seconds, he is contacted by the MU–2. The MU–2 had filed a flight plan which was contained on a flight strip. The flight strip was in Fritz's strip holder. The MU–2 contacted Fritz shortly after take-off stating that he was "off the ground Greenwood." At that moment, Fritz had more information than either pilot about the possibility of a collision. A reasonable ATC would have issued some type of warning or at the very least, directed his attention to the radar scope. Fritz did neither of these things. An air traffic controller's failure to see and realize what was visible and discernable, followed by the failure to give immediate warnings, constitutes negligence.

Fritz's demeanor on the witness stand also plays a part in the court's evaluation of his traits as an ATC. Fritz was unable to remember basic information about the day of the collision. For example, Fritz did not remember whether he drank alcohol within 24 hours of the incident, whether he had taken any antihistamines on the day of the accident,[17] or how many flight strips he had.

---

16. Fritz had just finished providing radar service to the Saratoga, was radar identifying the MU–2 and was providing radar service to a third plane.

17. Solar Sources would like the court to infer that Fritz was taking antihistamines from his refusal to submit to a drug test. In support of its assertion, Solar Sources cites the court to case law setting forth the inference from an individual exercising his Fifth Amendment right not to testify. The court finds that the comparison is strained because the drug test at issue is optional, while a person only exercises his Fifth

Amendment rights if required to testify. Thus, the cases are not persuasive. Moreover, the drug test at issue would not have tested for the presence of antihistamine in the blood stream. The court will not infer that Fritz was taking antihistamine, though that is a possibility. If he had consumed antihistamines, that might be some explanation of the lack of alertness. However, regardless of why, Fritz was not sufficiently alert on the day in question to recognize the seriousness of the situation.

**1540**

Although the accident was several years ago, it should have been an important and memorable day for Fritz. Moreover, he was pulled off his scope shortly after the accident and interviewed, at that time he obviously would have been aware of the importance of his activities. Based upon Fritz's demeanor on the stand, the court finds that he did not appear particularly alert, knowledgeable, or diligent during testimony. Although evidence showed him to be a fully-qualified, full-performance ATC, his presence at trial did nothing to convince the court that he approached his work on the crucial day in question with adequate alertness, diligence, or vigilance.

▬ Fritz's failure to issue a warning was a proximate cause of this accident. There was a great deal of testimony about whether Fritz had time to formulate a warning and issue it in time for the MU–2 to avoid the collision. The court finds that sufficient time was available to issue a warning. The critical transmission occurred when Mullen stated that he was "off the ground at Greenwood." From the time of the end of this transmission at 1956:48 until the collision at 1957:07–1957:11, Fritz had at least nineteen seconds and possibly twenty-three seconds. Although pilot reaction time could be anywhere from 3 to 12.5 seconds, *see Rodriquez v. United States*, 823 F.2d 735, 745 (3d Cir. 1987) (finding that a pilot needs 10 seconds to respond to a warning), this would still have given Fritz ample time to realize there was a potential problem, possibly look at his scope to confirm it, and issue an appropriate warning to which the pilots would have had time to react. Thus, Fritz's negligence was a proximate cause of this collision.

▬ The United States is liable for the negligent acts or omissions of air traffic controller, Fritz. Controller Fritz breached his duties and was negligent in that he knew, or should have known, from the information available to him, that the Saratoga and MU–2 were on a collision course and Fritz negligently failed to issue warnings to either of the pilots even though he had time to do so. His negligence was a proximate cause of this collision. Fritz's negligence constitutes 25%

of the total fault contributing to the collision in question.

## IV. CONCLUSION

The comparative fault of the three defendants is as follows:

| | |
|---|---|
| United States: | 25% |
| Solar Sources: | 5% |
| Control Systems Engineering: | 70% |

Based on these findings and conclusions, fault is apportioned in these percentages. The comparison of fault in this case was not an easy task. Ultimately, though, the preponderance of the evidence leads to this result. To a certainty, however, it was the unique simultaneous occurrence of these negligent acts which caused this tragic collision.

ALL OF WHICH IS ORDERED.